Clerk's Office
Filed Date: 10/31/2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

FJN:NDB/RMP
F.# 2022R00883/OCDETF #NY-NYE-865

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            22-CR-493 (NM)

    - against -

GORAN GOGIC,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S DETENTION MEMORANDUM

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nomi Berenson
Robert Pollack
Assistant United States Attorneys
(Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its request that the defendant Goran Gogic be removed in custody and detained pending trial. On October 30, 2022, federal agents arrested the defendant as he was boarding an international flight departing Miami, Florida to Zurich, Switzerland. The defendant is expected to make his initial appearance on a removal complaint in the Southern District of Florida today, and the government will request that he be detained as a flight risk and danger to the community, and that he be transported to the Eastern District of New York in custody to be arraigned on the indictment. For the reasons set forth below, at his arraignment in this district, the Court should enter a permanent order of detention, as no condition or combination of conditions can secure the defendant's appearance at trial and the safety of the community.

STATEMENT OF FACTS[1]

This case stems from an extensive federal investigation into the criminal activities of a vast international narcotrafficking conspiracy responsible for transporting multi-ton loads of cocaine. The defendant and his co-conspirators used commercial container maritime vessels that transited from South America to the United States to Europe to transport cocaine for cartels in the Balkans.

In coordination with the defendant, members of the conspiracy loaded commercial cargo ships at night on the high seas near the coast and ports of Colombia, Ecuador, and Peru, working with crewmembers who would hoist loads of cocaine from speedboats that approached the ships at multiple points along their route. To physically load the cocaine aboard, they used the ship's cranes as well as nets. Once the cocaine was onboard, the crewmembers would secrete it within specific shipping containers that they knew had room to conceal the large quantities of cocaine they were trafficking and for which they had duplicate counterfeit container seals. They selected the specific containers to be used to conceal the cocaine based, in part, on the containers' location and orientation, and route and destination on board the vessel. This complex operation relied on the defendant and his co-conspirators having access to each ship's crew, route, manifest, real-time positioning and geolocation data, and a knowledge of what legitimate cargo was contained in each container. The defendant coordinated with a different set

---

[1] As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention. See United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2d Cir. 1995). As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all the evidence of which the government is aware or which it will seek to introduce at trial.

of workers with access to the ports in Europe to clandestinely access and remove the cocaine from the shipping containers upon their arrival.

U.S. law enforcement officers intercepted and seized three of these shipments. On February 27, 2019, federal agents seized approximately 1,437 kilograms of cocaine secreted aboard the MSC Carlotta at the Port of New York and New Jersey.[2]  Agents boarded the vessel and conducted a search of the common areas, crew quarters, working areas, and cargo holds. Agents also interviewed crew members.  During the inspection of the containers, agents recovered approximately 60 large bundles that contained a white powdery substance hidden within a container.  Each bundle contained two large packages, each wrapped in several layers of plastic and rubber.  Each package contained several bricks of the white powdery substance. Laboratory testing confirmed that the substance was cocaine.  Agents also recovered a fraudulent container seal.

On the March 18, 2019, federal agents seized approximately 537 kilograms of cocaine secreted aboard the MSC Desiree at the Port of Philadelphia.[3]  Agents boarded the vessel and conducted a search of the common areas, crew quarters, working areas, and cargo holds. Agents also interviewed crew members.  Several suspicious containers onboard the ship were off-loaded and examined.  Agents noted that one particularly suspicious container held 13 black duffel bags atop legitimate cargo.  Following a positive canine alert for narcotics in the container, agents scanned and then transported the container offsite for further inspection.  The further search resulted in the discovery of cocaine bricks inside the duffel bags.  Agents also recovered a fraudulent container seal and a pair of bolt cutters from the container.

---

[2]     Photographs of the February 27, 2019 seizure are attached as Exhibit A.
[3]     Photographs of the March 18, 2019 seizure are attached as Exhibit B.

On the June 19, 2019, agents seized approximately 17,956 kilograms of cocaine secreted aboard the MSC Gayane at the Port of Philadelphia.[4] Agents boarded the vessel and conducted a search of the common areas, crew quarters, working areas, and cargo holds. Agents also interviewed crew members. During the inspection of the MSC Gayane, agents observed anomalies on several of the containers' security seals. After opening suspicious containers, agents observed in seven containers bales and bags consistent with narcotics smuggling. Those containers were off-loaded, examined, and found to contain 17,956 kilograms of cocaine. A black plastic bag containing approximately $48,000 in Euros and U.S. currency was also recovered. Several members of the crew were arrested and prosecuted in the Eastern District of Pennsylvania for narcotics distribution offenses. The seizure of the cocaine from the MSC Gayane—worth over $1 billion—was one of the largest seizures of cocaine in United States history.

Law enforcement officers also seized significant amounts of cocaine related to the conspiracy at ports in Panama, Peru, and the Netherlands, among other countries.

The defendant's role in the conspiracy was integral as he oversaw the logistics for getting the cocaine from South America to Europe via the United States. The defendant coordinated with: (i) crewmembers aboard the maritime commercial cargo vessels used to transport the above-described cocaine; (ii) narcotraffickers in Colombia who oversaw and managed the sources of cocaine and speedboat workers who physically loaded the cocaine aboard the vessels; and (iii) dockworkers at the ports in Europe who could receive the cocaine once it arrived and was offloaded from the vessels. The defendant did these criminal acts to

---

[4] Photographs of the June 19, 2019 seizure are attached as Exhibit C.

further his own aims and those of Balkan-based cartels for which the defendant procured cocaine.

On October 28, 2022, a grand jury sitting in the Eastern District of New York indicted the defendant for one count of conspiracy to violate the Maritime Drug Law Enforcement Act ("MDLEA") and three substantive counts of violating the MDLEA, in violation of Title 46, United States Code, Sections 70503(a)(1), 70503(b), 70504(b)(2), 70506(a) and 70506(b), and Title 21, United States Code, Section 960(b)(1)(B)(ii).  The substantive counts relate to the significant cocaine shipments that were seized by law enforcement from the MSC Carlotta, MSC Desiree, and MSC Gayane at United States ports, as described above.  Each of the counts that the defendant faces carry a mandatory minimum term of ten years' imprisonment and a potential life sentence.

The defendant is a citizen of Montenegro without legal immigration status in the United States.  He has never traveled to the United States before and was apprehended as he attempted leaving the country for Switzerland.  He has no known ties to the United States other than his extensive narcotics trafficking.

ARGUMENT

I.      Legal Standards

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., a federal court must order a defendant detained pending trial where it determines that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more and the Court finds probable cause to believe that the defendant committed such offense. 18 U.S.C. § 3142(e)(3)(A). Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. See United States v. Contreras, 776 F.2d 51, 54–55 (2d Cir. 1985).

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3124(e)(3). The defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight. See 18 U.S.C. § 3142(f); Mercedes, 254 F.3d at 436; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985). In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable incentive to flee," United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993), as does the possibility of a severe sentence, see United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); see also United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

Courts consider several factors in making the determination of whether pretrial detention is appropriate: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. See 18 U.S.C. § 3142(g). Even where the defendant has met his burden of production to rebut the statutory presumption in favor of detention, the presumption also remains a factor for the Court to consider. Mercedes, 254 F.3d at 436.

8

II.  A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, because the defendant is charged with multiple counts under the MDLEA for which the maximum term of imprisonment is life, he is presumed to pose a danger to the community and a risk of flight. Accordingly, the defendant bears the initial burden of showing that he is not a danger to the community or a flight risk. For the reasons set forth below, the defendant cannot sustain that burden.

III. The Defendant Is a Danger to the Community

The facts and circumstances of this case compel the defendant's detention, as the factors set forth in the Bail Reform Act show that his criminal activity and narcotics trafficking poses a danger to the community. At the outset, the serious nature and circumstances of the charged offenses—conspiracy to violate and substantive violations of the MDLEA involving the international distribution of twenty-plus tons of cocaine—is self-evident. Individuals, like the defendant, who are involved in this level of narcotrafficking are responsible for the movement of billions of dollars' worth of dangerous drugs, and sophisticated narcotrafficking organizations like the defendant's routinely employ threats of violence and violence in the course of their business. Indeed, following several seizures made during this investigation, the defendant specifically sought to locate and identify a "snitch," who he suspected was responsible for the seizures. Additionally, the defendant and his co-conspirators peddle deadly products, which have contributed to the overdose and drug addiction crisis in the United States and throughout the world.

The weight of the evidence against the defendant is strong and also favors detention. It includes, without limitation: (1) multiple cooperating witnesses who are familiar with the defendant's pivotal role coordinating with crewmembers aboard maritime commercial cargo vessels used to transport the cocaine, the investors and sources of supply in Colombia, the investors and owners of the cocaine in the Balkans, and the workers who receive and distribute the cocaine at European ports; (2) electronic communications, including recordings of meetings at which conspirators discussed the charged drug loads and seizures and the losses flowing from the seizures; (3) the drug seizures themselves, including photographs of the narcotics recovered, their branded stamps and packaging, and reports of laboratory testing; and (4) documentary evidence including photographs of the defendant at meetings with co-conspirators to discuss narcotics trafficking. The recorded communications include specific discussion of the defendant's role in the conspiracy, including his contact with various Colombian narcotraffickers who loaded the maritime vessels separately, and his discretion and control over deciding how the different groups of investors would divvy up the losses flowing from particular seizures. The recordings also include discussion among the defendant's conspirators concerning the defendant's suspicions and inquiries about finding a "snitch" after law enforcement had made several seizures.]

The defendant's position as a high-level narcotrafficker for Balkan cartels also speaks to his and his conspirators' dangerousness. Broadly speaking, their drug distribution conduct presents a clear and widespread danger to the community. Additionally, Balkan cartels like the ones that employ the defendant are known to employ kidnapping and murder in furtherance of their drug distribution activities.

The defendant's release also poses a danger to the community given the ease with which he can continue to engage in criminal conduct if released by, among other things, directing conspirators to continue engaging in narcotics trafficking on his behalf. See Millan, 4 F.3d at 1048 ("dangerousness" encompasses "'the danger that the defendant might engage in criminal activity to the detriment of the community'" (quoting legislative history)); Leon, 766 F.2d at 81 (dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking"). That danger is particularly pronounced here given the defendant's access to narcotraffickers across South America and Europe.

In sum, the defendant would undoubtedly present a significant danger to the community. No condition or combination of conditions can assure its safety.

IV. The Defendant Poses a Significant Risk of Flight

The Defendant should also be detained because he is presumed a flight risk and no conditions or combination of conditions can assure his appearance at trial. The prospect of a term of life in prison in the United States creates a powerful incentive for the defendant—a man with no ties to the United States—to flee should he be released on bond. See, e.g., 21 U.S.C. § 960(b)(1)(B)(ii) (carries a mandatory minimum sentence of ten years and a maximum sentence of life). When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure a defendant's appearance. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order) ("[T]he presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence."). If released, the defendant could flee to

any number of countries where extradition would be unlikely. For example, the defendant could return to his home country of Montenegro, which does not extradite its own citizens.

Additionally, the defendant has no legal status in the county. Moreover, he has never traveled to the United States before and was apprehended as he attempted leaving the country. He has no known ties to the United States other than his narcotrafficking activity. Given his absence of any connection to the United States and his extensive ties to Montenegro, the defendant constitutes a significant risk of flight.

Finally, any proposed use of home detention and/or electronic monitoring would be wholly inadequate considering the foregoing. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (noting home detention "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills"); United States v. Zarrab, No. 15 CR 867 (RMB), 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016).

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court order the defendant to be detained permanently pending trial, as there is no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance at trial.

Dated: Brooklyn, New York
October 31, 2022

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/
Nomi Berenson
Robert Pollack
Assistant U.S. Attorneys
(718) 254-7000