UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
─────────────────────────────

UNITED STATES OF AMERICA,

    -against-

GORAN GOGIC,

    *Defendant.*

22-CR-493 (ARR)

**OPINION & ORDER**

ROSS, United States District Judge:

    Defendant, Goran Gogic, is charged with coordinating the transport of more than 20 tons of cocaine by way of the United States, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501 *et seq*. As proof of his role in the drug trafficking operation, the government plans to offer logs of encrypted messages, allegedly sent or received by Mr. Gogic, that were intercepted and decoded by European intelligence officers. Mr. Gogic moves to suppress the messages, to exclude the messages under the Federal Rules of Evidence, and to compel the discovery and production of additional material.[1] For the reasons set forth below, Mr. Gogic's motions to suppress and/or exclude evidence related to the intercepted messages are denied. The motion to compel is denied, except as it concerns recordings of, or documents pertaining to, the defendant's own statements.

## BACKGROUND

    The facts set forth herein are drawn from the indictment, ECF No. 1 ("Indictment"), the parties' moving papers, and the exhibits attached to the parties' papers. *See* Mot. to Suppress, to

---

[1] Mr. Gogic also moves to suppress corroborating evidence from his personal cell phone, which was seized upon his arrest in the United States. *See* Def.'s Mot. at 74–87. This motion will be resolved in a forthcoming order, after an evidentiary hearing.

Preclude, and to Compel Discovery, ECF No. 69 ("Def.'s Mot."); Mem. of Law in Opp'n to Mot. to Suppress, ECF No. 71 ("Gov't Opp'n"); Reply to Gov't Opp. to Mot. to Suppress, ECF No. 74 ("Def.'s Reply"); Def.'s Suppl. Letter Concerning New Developments, ECF No. 77 ("Def.'s Suppl. Letter").

*Charges & Procedural Background*

Mr. Gogic is a citizen of Montenegro who, according to the government, had never visited the United States prior to October 2022. Gov't Opp'n at 3. The government alleges that Mr. Gogic was part of an international network of drug traffickers who moved large quantities of cocaine on commercial container ships traveling from South America to Europe, to supply Balkan-based cartels. *Id*. at 2; Def.'s Mot. at 9. The cocaine was loaded onto the ships at sea off the coast of Colombia, Ecuador, and Peru and hidden in pre-selected shipping containers, which were resealed by participating crewmembers, before continuing on to Europe, sometimes by way of the United States. Gov't Opp'n at 2. Mr. Gogic purportedly oversaw the logistics for this complex operation by coordinating with various arms of the conspiracy, including suppliers in Colombia, crewmembers aboard the ships, dockworkers in Europe, and cartel-affiliated distributors. *Id*. at 3; Def.'s Mot. at 9. Between February and June of 2019, U.S. law enforcement intercepted three such shipments aboard ships docked at U.S. ports and seized more than 19,000 kilograms of cocaine, worth over $1 billion. Gov't Opp'n at 2–3; Def.'s Mot. at 9.

On October 28, 2022, a grand jury in this district returned a four-count indictment charging Mr. Gogic with one count of conspiracy to violate the MDLEA and three substantive counts of violating the MDLEA, 18 U.S.C §§ 70503(a)(1), 70503(b), 70504(b)(2), 70506(a), 70506(b); 21 U.S.C. § 960(b)(1)(B)(ii), based on the three 2019 seizures of cocaine at U.S. ports. Indictment ¶¶ 1–4. Mr. Gogic was arrested two days later in Miami, Florida, where he was about

to board a flight to Europe following a trip to Puerto Rico. Gov't Opp'n at 3; Def.'s Mot. at 51. After his arrest, Mr. Gogic was transported to Brooklyn, where he was arraigned on January 18, 2023, and has been detained ever since. *Id*.

At trial, the government intends to offer evidence that members of the conspiracy, including Mr. Gogic, used cell phones equipped with a specialized encryption platform, called Sky ECC, to communicate about their criminal activities. Gov't Opp'n at 3–4. Among this evidence are logs of intercepted conversations, allegedly involving Mr. Gogic, that openly discuss narcotics trafficking and include multiple references to the ships from which the cocaine was seized. *Id*. at 7. In the instant motion, Mr. Gogic challenges the admissibility of the intercepted Sky ECC messages and moves for an order compelling the government to produce, *inter alia*, additional information about the intelligence operation through which the messages were obtained. Def.'s Mot. at 51–73; 87–91. Mr. Gogic requests a hearing on the motion. Def.'s Reply at 10.

### *Sky ECC Platform & European Investigation*

Sky ECC was a subscription-based messaging platform that came pre-installed on phones sold by a Canadian company, Sky Global, prior to the platform's dismantling in 2021. Def.'s Ex. K, Expert Report of Rafael Villena y Scheffler at 1–2, ECF No. 69-12 ("Villena Report"); Gov't Opp'n at 4. The platform equipped phones with several unique security features, such as "Pretty Good Privacy" encryption and the automatic deletion of messages after they were read or after the phone was disconnected from the network for 48 hours. *Id*.; Def.'s Ex. M, Expert Report of Andreas Milch at 4–8, ECF No. 69-14 ("Milch Report"). For obvious reasons, the proliferation of Sky ECC posed a challenge for law enforcement seeking to recover messages on devices seized from suspected criminals, especially because Sky Global was not willing to cooperate

with law enforcement. Def.'s Ex. J, Certified Translation, Judicial Interception Authorization Request at 47, ECF No. 70-11 ("Interception Req."). *See generally* Def.'s Ex. A, Europol Report at 6–9, ECF No. 69-2 (describing the law enforcement challenges posed by encrypted communications).

According to Mr. Gogic—whose chronicle the government does not dispute for the purpose of this motion—law enforcement officials from multiple countries, including the United States, participated in a 2018 conference to discuss how to address the intelligence challenges posed by the use of Sky ECC among suspected criminals. Def.'s Mot. at 19–20. Around the same time, U.S. officials initiated an investigation with the goal of criminally prosecuting Sky Global executives in Canada. *Id*. at 58–59; Interception Req. at 48; *see* United States v. Jean-Francois Eap, 21-CR-822 (S.D. Cal. filed March 12, 2021). Meanwhile, law enforcement agencies in three European countries—Belgium, the Netherlands, and France—were working collaboratively to investigate the platform's technical operation and user base. *See* Interception Req. at 46–48. By 2019, the European investigators had determined that the Sky ECC servers were located in France, and French law enforcement sought judicial authorization to monitor traffic on the servers. *Id*. at 48. In June 2019, a French judge granted the wiretap request and authorized the initial interception of all communications on the Sky ECC servers. Villena Report at 3. In November 2019, the three countries formalized their collaboration as a "Joint Investigation Team" ("JIT") to determine how to decode the still-encrypted messages. *See* Certified Translation, JIT Agreement between Belgium, France, and the Netherlands, at 2, Def.'s Ex. H, ECF 69-9 ("JIT Agreement"); Def.'s Mot. at 20–21. Once a method of decryption was identified, a French judge authorized several weeks of additional message interception for all Sky ECC users, from December 2020 until approximately March 2021, when the JIT investigation was

4

revealed to the public. Villena Report at 3; Def.'s Ex. L, Europol Press Release from March 10, 2021, ECF No. 69-13. European press coverage of the operation estimates that, during the course of the live monitoring, European authorities intercepted more than 1 billion messages sent by approximately 170,000 users located all over the world. *See* Def.'s Mot. at 22 (citing press coverage); Def.'s Reply at 5 (discussing geographic scope of surveillance).

As the data was intercepted, it was analyzed by members of the JIT in accordance with the JIT Agreement. Def.'s Ex. G, Expert Report of Yehudi Moszkowicz at 2–3, ECF No. 69-8 ("Moszkowicz Report"). According to one of Mr. Gogic's experts, some of the messages were analyzed in the Netherlands using a software program called "ChatX," which was programmed to flag concerning messages based on their content. *Id*. at 4–5. The same expert also states that the centralized EU law enforcement agency, "Europol," had primary responsibility for compiling "intelligence packages" for law enforcement in other countries. *Id*. at 2–3. It is unclear from the record whether ChatX or Europol had any role in the identification of Mr. Gogic's messages specifically.

### *Sky ECC Evidence in This Case*

The parties' moving papers reference several categories of evidence related to Mr. Gogic's purported use of Sky ECC to communicate about narcotics trafficking. *See* Def.'s Reply at 16 (discussing screenshots of messages sent between a government witness and device thought to belong to Mr. Gogic); Def.'s Suppl. Letter at 1 (discussing video of individual scrolling on a phone to "display an alleged Sky ECC conversation"); Gov't Opp'n at 3–4 (discussing anticipated testimony of cooperating witnesses). Mr. Gogic's motion to suppress, however, concerns only one category of evidence: a set of files containing logs of intercepted Sky ECC messages, purportedly sent or received by Mr. Gogic, from which the government plans to offer

5

excerpts at trial. *See* Def.'s Mot. at 26–37; Def.'s Reply at 10–40; Gov't Opp'n 3–4.

It is undisputed that the message logs were sent to the government from France, pursuant to a Mutual Legal Assistance Treaty ("MLAT").[2] Gov't Opp'n at 1, 4; *see* Def's Reply at 15 ("[T]he Excel spreadsheets at issue were sent to the U.S. by the *French government*[.]"). According to the government, a federal law enforcement agent specifically requested data associated with two Sky ECC accounts thought to belong to Mr. Gogic after the agent learned that the French government had obtained materials from the platform. Gov't Opp'n at 4. The French official responded by sending a set of spreadsheets, along with a certification document signed by a French judicial officer. *Id.*; *see* Def.'s Ex. O, Certified Translation of Report from French Judicial Police, ECF No. 69-16.

The spreadsheets sent from France are grouped in folders based on the two Sky ECC accounts with which they are associated. Gov't Opp'n at 4. In each folder, there is a spreadsheet of metadata (*e.g.* associated chat aliases and device numbers) and a series of subfolders for different conversations or "chats" between the identified account and one or more other users. *Id.* at 4–5. Each subfolder contains a spreadsheet of captured communications between the specified users and, where applicable, copies of intercepted media files. *Id.* at 5; Def.'s Mot. at 27–30; *see* Milch Report at 29–44 (describing and providing screenshots of spreadsheets and media files). Many of the chat spreadsheets contain only one side of the conversation. Def.'s Mot. at 38.

---

[2] While Mr. Gogic strenuously argues that the spreadsheets do not reflect the "original data" in the form in which it was *intercepted*, Def.'s Mot. at 27, he does not dispute that the spreadsheets themselves were sent to the government from France in response to a specific request, *see id.* at 29–33; Def.'s Reply at 15. Thus, notwithstanding Mr. Gogic's arguments regarding authentication and completeness, there is no dispute regarding the form in which the government obtained the data from which it will seek to create exhibits for trial. *Cf.* Moszkowicz Report at 4 (speculating that the Sky ECC messages were "likely . . . provided to the United States government" in a different "software interface" pictured in his report).

The government represents that it has produced files to the defense team in the same form in which they were received from France, and that there is no alternative version of the intercepted communications to which the government has access. Gov't Opp'n at 16–18. At trial, the government indicates that it will offer "relevant excerpts" from the captured communications, which will be authenticated by the federal agent who received the files directly from France. *Id*. at 4.

## DISCUSSION

### I. Suppression of the Sky ECC Messages is Not Warranted.

Mr. Gogic moves to suppress the Sky ECC message logs on the grounds that admitting evidence obtained through "suspicionless mass surveillance" would violate his constitutional rights. Def.'s Mot. at 51–53. First, he argues that the data must be suppressed because it was gathered without a warrant or individualized suspicion of wrongdoing, in violation of the Fourth Amendment. *Id*. at 52. Second, Mr. Gogic argues that, regardless of the application of the Fourth Amendment, the data should be excluded because the method of surveillance "shocks the conscience." *Id*. at 53–54. Finally, Mr. Gogic argues that the data should be suppressed because its admission in the form in which the government received it, without the underlying "raw" data, would violate his rights under the Due Process Clause of the Fifth Amendment. *Id*. at 60–63.

#### A. No hearing is required.

In assessing a defendant's motion for suppression, an evidentiary hearing is required only where the moving papers indicate a dispute of material fact. *See United States v. Robinson*, 153 F. Supp. 2d 188, 191 (E.D.N.Y. 2001) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)). "[A] district court is *not* required to hold an evidentiary hearing if the defendant's 'moving papers did not state sufficient facts which, if proven, would have required the granting of the relief

requested.'" *Id.* (quoting *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969) (emphasis added). In assessing Mr. Gogic's arguments for suppression, I have taken his presentation of the method by which the message data was obtained as true and concluded that, even on these facts, suppression is not warranted. As such, no hearing is required to resolve this issue.[3]

### B. The Fourth Amendment does not apply to the interception of the Sky ECC messages.

The Fourth Amendment prohibition against unreasonable searches and seizures ordinarily requires law enforcement to obtain a warrant, supported by probable cause, before intercepting private communications. *See Berger v. State of N.Y.*, 388 U.S. 41, 51 (1967) (holding that "the use of electronic devices" to capture a "conversation" is a "search" within the meaning of the Fourth Amendment); *Katz v. United States*, 389 U.S. 347, 352–54 (holding that the Fourth Amendment "extends . . . to the recording of oral statements overheard without any 'technical trespass'" upon property).

However, the Supreme Court has explained that "the purpose of the Fourth Amendment [is] to protect the people of the United States against arbitrary action by their own Government," and was "never . . . intended to restrain the actions of the Federal Government against aliens outside of the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990). Accordingly, the Fourth Amendment protects only those individuals who are members of the "national community" by virtue of citizenship or prior "voluntary connection with this country." *Id.* at 272. Similarly, the Fourth Amendment's exclusionary rule, which is designed to deter misconduct by U.S. law enforcement, does not apply to evidence obtained by foreign officers on

---

[3] By contrast, I have concluded that a hearing is required to resolve Mr. Gogic's motion to suppress the corroborating evidence obtained from his personal cell phone while he was in custody. That issue will be addressed in a separate order filed concurrently with this opinion.

8

foreign soil, even if the subject is an American citizen. *See United States v. Lee*, 723 F.3d 134, 139 (2d Cir. 2013); *Stowe v. Devoy*, 588 F.2d 336, 341 (2d Cir. 1978). When contested, it is the defendant's burden to establish that that the Fourth Amendment applies to the search or seizure in question. *See United States v. Loera*, 24 F.4th 144, 182 (2d Cir. 2022) ("[D]efendant can only invoke the Fourth Amendment if he has established substantial voluntary connections to the United States.").

Here, Mr. Gogic has not met his burden of showing that he is entitled to invoke the protections of the Fourth Amendment. It is undisputed that Mr. Gogic is a citizen of Montenegro and has never been a citizen of the United States. There is also no evidence that Mr. Gogic had ever entered the United States prior to the month of his arrest, Gov't Opp'n at 11, which means that he was abroad at the time the Sky ECC messages were intercepted. Mr. Gogic does not make any assertions to the contrary, nor does he offer evidence of any other connections with the United States. *See* Def.'s Reply at 7–8 (acknowledging and not disputing government's assertion that "Mr. Gogic has no ties to the United States to speak of"). "Because the defendant is a foreign national abroad and the evidence was seized abroad, the warrant and reasonableness requirements of the Fourth Amendment—and thus, the exclusionary rule—do not apply." *United States v. Vega*, No. 7-CR-707, 2012 WL 1925876, at *5 (E.D.N.Y. May 24, 2012). *See also United States v. Gasperini*, No. 16-CR-441, 2017 WL 3038227, at *3 (E.D.N.Y. July 17, 2017) ("As Defendant has consistently emphasized, he lacked any connection to the United States prior to his extradition into this country. As such, he cannot claim that searches of his data stored outside the U.S. violated his Fourth Amendment rights." (internal citation omitted)), *aff'd*, 894 F.3d 482 (2d Cir. 2018).

Even if Mr. Gogic could demonstrate a substantial connection with the United States, the Fourth Amendment would still be inapplicable because the search in question was conducted by

foreign officials. *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013). While Mr. Gogic acknowledges that the Fourth Amendment is generally inapplicable to evidence obtained by foreign officials, he argues that it does apply here, under the "intent to evade" exception, because the government cooperated with European law enforcement in order to circumvent the Constitution. Def.'s Mot. at 57–59. This exception to the "general rule against suppressing evidence collected by foreign law enforcement," requires evidence of "some intent to evade American constitutional requirements." *Getto*, 729 F.3d at 227, 232. As evidence of such intent, Mr. Gogic points to the French wiretap application, which references the willingness of "American . . . authorities" to pause their operation until the conclusion of the European surveillance efforts. Def.'s Mot. at 59–60 (discussing Interception Req. at 5).

Even assuming that Mr. Gogic's characterization of the investigatory arrangement is true—that is, that U.S. officials did in fact agree to delay arrests "in exchange for data," *id*. at 60—it does not demonstrate the kind of nefarious intent required to trigger an extraterritorial extension of the Fourth Amendment. The record establishes that the European surveillance operation was wholly designed and carried out by members of the JIT to advance their own countries' intelligence efforts—not at the behest of the United States. *See* JIT Agreement at 3–4. In fact, by Mr. Gogic's own account, U.S. authorities learned about the interception plan only once it was already underway, when "the Europeans were *on the verge* of making th[e] planned hack," Def.'s Mot. at 58 (emphasis added); *see also* Moszkowicz Report at 5 (stating that European officers learned of U.S. investigation in May 2019). The mere fact that the U.S. government agreed to delay making arrests to preserve the covert nature of the European efforts, *see* Def.'s Mot. at 2–3 (stating that U.S. investigators delayed arrests so as not to "tip off Sky ECC users"), would not be indicative of any intentional evasion of the Fourth Amendment. As the Second Circuit has explained,

10

evidence of "successful coordin[ation]" with foreign law enforcement, without more, does not require suppression under the "designed to evade" exception. *Getto*, 729 F.3d at 233.

### C. The alleged conduct of European law enforcement does not shock the conscience.

Alternatively, Mr. Gogic argues that I should exclude the Sky ECC message data because the foreign intelligence operation through which it was obtained "shocks the conscience." Def.'s Mot. at 53. This basis for exclusion "stems not from the Fourth Amendment, but instead from a federal court's authority to exercise its supervisory powers over the administration of federal justice." *Getto*, 729 F.3d at 229. The Second Circuit has instructed that this authority to exclude material evidence "must be sparingly exercised," *id*. at 230 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952), and applies only when the conduct in question "violate[s] fundamental international norms of decency," *id*. at 229 (quoting *United States v. Mitro*, 880 F.2d 1480, 1484 (1st Cir. 1989)). For example, the Second Circuit has stated that interrogation by "torture or terror" such as "rubbing pepper in the eyes," might constitute conduct that shocks the judicial conscience. *Id*. (citations omitted); *see also Rochin*, 342 U.S. at 172 (describing the forcible removal of subject's stomach contents to reveal evidence as "shocking").

Mr. Gogic argues that the actions of European law enforcement, though they did not involve torture or other physical abuse, were egregious enough to shock the conscience. Def.'s Mot. at 54. Specifically, Mr. Gogic argues that suspicionless, mass collection of private communications based solely on the subjects' choice of platform violates "fundamental norms of decency," Def.'s Mot. at 54–55, and degrades data privacy, Def.'s Reply at 4–5. As evidence of those international norms, he cites several European cases that cast doubt on the admissibility of evidence obtained through large-scale surveillance efforts, including at least one case from

11

Slovenia concerning the Sky ECC intelligence operation specifically. Def.'s Mot. at 43– 49; Villena Report at 9–14; *see also* Def.'s Suppl. Letter at 2–3.

      While I agree with Mr. Gogic that physical torture is not necessarily required to meet the shock-the-conscience exception, Def.'s Reply at 1, I cannot agree that the exception applies here, even if I accept his description of the intelligence operation as true. To start, my review of the case law leads me to conclude that the shocks-the-conscience exception primarily concerns evidence obtained through interrogation or coercion, rather than through covert surveillance. This interpretation accords with the Second Circuit's statement that "conduct did not shock the judicial conscience when, for example, there was no . . . custodial interrogation of any kind." *Getto*, 729 F.3d at 229 (internal quotations and citation omitted). An emphasis on coercion is also consistent with the doctrine's purpose: "to preserve the *integrity* of the criminal justice system." *Id*. (quoting *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995) (emphasis added). Because evidence obtained through torture and other means of coercion is "not trustworthy," *U.S. ex rel. Caminito v. Murphy*, 222 F.2d 698, 702 (2d Cir. 1955), its exclusion serves to promote fair and reliable outcomes. Excluding text messages that were intercepted without the sender's knowledge, by contrast, does not serve the same doctrinal goals. *See also United States v. Larrahondo*, 885 F. Supp. 2d 209, 221–22 (D.D.C. 2012) (concluding that Columbian law enforcement's surveillance of "an enormous number of calls" does not "rise[] to the level of shocking the conscience").

      I find further support for my conclusion in the fact that the surveillance was, according to Mr. Gogic's own narrative, conducted under judicial supervision in accordance with French law. *See* Def.'s Mot. at 17, 21. As the Second Circuit has explained, "wiretap evidence may be admissible when foreign officials, acting on their own to enforce foreign law, properly follow their own law in obtaining the evidence," even if that country's procedures "f[a]ll short of Fourth

Amendment standards." *Maturo*, 982 F.2d at 61. Such compliance serves as one indication, even if not definitive proof, that the surveillance does not violate fundamental international standards of decency. *See Barona*, 56 F.3d at 1092 (noting that wiretap in which "foreign courts were involved and purported to authorize . . . d[id] not come close to" meeting the exception); *cf.* Def.'s Reply at 6.

### D. There is no evidence of a Due Process violation.

Finally, Mr. Gogic argues that the admission of excerpts of the message logs received from France would violate due process since he has not had an opportunity to "examin[e] the raw, underlying data[.]" Def.'s Mot. at 63. In making this argument, he invokes the government's obligation under the Due Process Clause—and set forth in under *Brady v. Maryland*, 373 U.S. 83 (1963)—to turn over favorable evidence known to the government and "material" to guilt or punishment. *Id*. at 87; *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).

*Brady* does not require the prosecution "to search for exculpatory material not within its possession or control," except "where the U.S. Attorney's Office conducts a joint investigation with another state or federal agency." *United States v. Raniere*, 384 F. Supp. 3d 282, 325 (E.D.N.Y. 2019); *see also Kyles v.* Whitley, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the *others acting on the government's behalf* in the case[.]" (emphasis added)). In the absence of any particularized showing that favorable evidence is being withheld, the government's good faith assertion that it has complied with its *Brady* obligations is generally sufficient to defeat a defendant's assertion of a violation. *United States v. Numisgroup Int'l Corp*., 128 F. Supp. 2d 136, 150 (E.D.N.Y. 2000).

Here, the government has repeatedly indicated that it has produced all discoverable material and does not know of or possess any other version of the intercepted messages. Gov't

13

Opp'n at 16–18. Given that Mr. Gogic has not provided any particularized evidence to the contrary, I am satisfied by the government's representations and will not suppress the messages based on the government's failure to produce an alternative version of the data that conforms to Mr. Gogic's specifications.

## II. The Other Evidentiary Objections are Premature.

In addition to his constitutional arguments, Mr. Gogic moves to exclude the Sky ECC data under various provisions of the Federal Rules of Evidence ("FRE"). Def.'s Mot. at 64–74. First, he argues that the Sky ECC message spreadsheets are inadmissible "summaries" under FRE 1006 because the "original underlying records" have not been made available to the defense team. *Id*. at 65. Second, he argues that portions of the message logs that show only sent messages without those messages "received in response" are inadmissible under the Rule of Completeness, FRE 106. *Id*. at 67. Third, he argues the messages should be excluded under FRE 403 because the probative value of the messages is outweighed by the risk of unfair prejudice and the risk of misleading the jury. *Id*. at 69. Fourth, and finally, he argues that the message data is inadmissible because the government will be unable to authenticate it. *Id*. at 70–74. *See* FRE 901 & 902.

Evidentiary disputes of those kinds are frequently resolved through motions *in limine*, which allow the trial court to rule on the admissibility of specific pieces of evidence before trial. *Belvin v. Electchester Mgt., LLC*, 635 F. Supp. 3d 190, 196 (E.D.N.Y. 2022). The purpose of a motion *in limine* is "to aid the trial process" by allowing the court to resolve "forecasted" evidentiary issues "without lengthy argument at, or interruption of, the trial." *Id*. (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). Unlike motions to suppress, motions *in limine* are generally filed on "the eve of trial." *United States v. Sikkema*, 2024 WL 5077714, at *4 (S.D.N.Y. Dec. 11, 2024). That is because questions of admissibility frequently "turn[] on [the]

characteristics of the particular items of evidence and the purpose for which [those items] are offered," *United States v. Sterritt*, No. 21-CR-193, 2023 WL 7386660, at *4 (E.D.N.Y. Nov. 8, 2023), or the factual context that emerges at trial, *see, e.g.*, *Woolfolk v. Baldofsky*, No. 19-CV-3815, 2022 WL 2600132, at *6 (E.D.N.Y. July 8, 2022); *United States v. Ulbricht*, 79 F. Supp. 3d 466, 487–88 (S.D.N.Y. 2015). As such, "a ruling on admissibility absent specification . . . as to exactly [what evidence the offering party] it seeks to admit" is generally "premature." *Sterritt*, 2023 WL 7386660, at *4; *see also Rivera v. Inc. Village of Farmingdale*, 29 F. Supp. 3d 121, 132 n.13 (E.D.N.Y. 2013); *Weschsler v. Hunt Health Sys., Ltd.*, No. 94-CV-8294, 2003 WL 21998985, at *2–3 (S.D.N.Y. Aug. 22, 2003). A court should exclude evidence prior to trial "only if it is clearly inadmissible on all potential grounds." *United States v. Watts*, 934 F. Supp. 2d 451, 462 (E.D.N.Y. 2013).

      Here, Mr. Gogic moves for the categorical exclusion of the Sky ECC message data well before the eve of trial and before the government has sought to admit any specific exhibits into evidence. Aside from the handful of figures in the defense expert reports, *see* Milch Report at 30–43, I have no sense of the format, substance, or evidentiary purpose of the exhibits that the government will ultimately seek to admit. Without additional information, I cannot meaningfully assess whether the government will be able to authenticate its exhibits in the manner described, *see* Gov't Opp'n at 19, nor whether the probative value of those exhibits will be outweighed by the risk of unfair prejudice. As such, I cannot conclude that all evidence from the Sky ECC message data is "clearly inadmissible" at this time. *Watts*, 934 F. Supp. 2d at 462.

      I therefore deny the motion to exclude as premature. However, given the unique provenance of the Sky ECC message data, the government is encouraged to address Mr. Gogic's arguments about authentication in its own motion *in limine* prior to trial.

### III. The Motion to Compel is Denied, Except as it Concerns Records of the Defendant's Own Statements.

Mr. Gogic moves to compel the government to produce a long list of additional materials. Def.'s Mot. at 88–91. Aside from a perfunctory invocation of *Brady* and Fed. R. Crim. P. 16, *id.* at 88, Mr. Gogic has not explained why he believes he is entitled to any of the seventeen categories of material listed. *See* Gov't Opp'n at 15. Nor has he indicated, for many of the materials, whether he has specifically requested them from the government and what, if anything, the government has provided in response. *See United States v. Torres*, No. 05-CR-838, 2006 U.S. Dist. LEXIS 48355, at *19 (E.D.N.Y. July 14, 2006) ("Rule 16 imposes obligations on both the government and the defense to disclose certain information and evidence *upon request of the other side*." (emphasis added)).

For several of the demands, the government has specifically indicated that the documents either do not exist or are not in the government's possession. Gov't Opp'n at 25–26. This includes the "full raw data and metadata" for the Sky ECC messages. Def.'s Mot. at 88, ¶ 2; *see* Def.'s Ex. X, Sept. 2024 Email Exchange, ECF No. 69-25. The government has repeatedly stated that it has produced all the data in the same form in which it was received from France, and that it does not have any other version in its possession. *See id.* ("[W]e produced to you all the data that we received."); Gov't Opp'n at 16–17, 25. Any alternative version of the data that may exist in France is not subject to disclosure under Rule 16. *See* Fed. R. Crim. P. 16(a)(1)(E) (requiring government production of documents or items "within the government's possession, custody, or control"). Nor could it be compelled under *Brady*, since the government does not have "an obligation to obtain exculpatory materials held by a foreign agency" unless the government was "engaged in a joint investigation . . . with that agency," *United States v. Connolly*, No. 16-CR-370, 2017 WL 945934

16

(S.D.N.Y. Mar. 2, 2017), which I have already explained was not the case here. The motion to compel an alternative version of the Sky ECC messaging data or metadata is therefore denied.

Several of the other demands concern materials that would likely be undiscoverable even if they were in the government's possession because they are "internal government documents" made "in connection with investigating and prosecuting the case." Fed. R. Crim. P. 16(a)(2). That exclusion likely covers documents describing the foreign investigation, decryption, and communications with foreign officers. Def.'s Mot. at 88–90 ¶¶ 1, 3–6. *See United States v. Loera*, No. 09-CR-4666, 2017 WL 2821546, at *7 (E.D.N.Y. June 29, 2017) (stating that "defendant has no entitlement" to information "regarding law enforcement investigation techniques"). I can infer from the motion that Mr. Gogic believes that these materials are relevant to his suppression arguments concerning the scope and nature of the European surveillance effort. Having ruled that the motion to suppress the Sky ECC data fails, however, I will not entertain arguments that the internal intelligence materials should be produced as *Brady* material in further support of that motion.

Most of the other demands concern material that is not discussed elsewhere in the motion, including materials related to the search of the three container ships, *id*. at 90 ¶¶ 7–8, 12–15, and various other materials related to the investigation, *id*. at 91–91 ¶ 10, 11, 16 & 17. Mr. Gogic does not indicate whether he has previously requested these items. Nor can I infer from his motion how these items would be "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E), or "favorable" to the accused, *Sunil Walia v. Holder*, 59 F. Supp. 3d 492, 506 (2014). The government, meanwhile, represents that it has produced "all currently discoverable material in its possession" and will continue to do so as new material becomes available or discoverable. Gov't Opp'n at 25. Where the government makes such "good faith representations . . . courts in this

Circuit deny specific discovery requests" under both Rule 16 and *Brady*. *United States v. Zelaya-Romero*, No. 15-CR-174, 2018 WL 1033235, at *3 (S.D.N.Y. Feb. 21, 2018); *Numisgroup Int'l*, 128 F. Supp. 2d at 150.

The only demand that I am inclined to grant is the one for "video or audio recordings" of Mr. Gogic during his arrest and detention. Def.'s Mot. at 90 ¶ 9. If such a recording exists, it would fall squarely within Rule 16(a)(1)(B), which requires the government to disclose any "written or recorded statement by the defendant" that is in the government's possession. This provision would also apply to written records reflecting Mr. Gogic's responses during the interrogation. Fed. R. Crim. P. 16 (a)(1)(B)(ii). It appears from the record that the government has already produced one set of interview notes from the day of the arrest. *See* Def.'s Ex. Q, Interview Notes, Homeland Security Investigations (Oct. 30, 2022), ECF No. 69-18. If there are other recordings or written records pertaining to Mr. Gogic's statements on October 30 or 31, 2022, the government is ordered to disclose them.

With respect to the other materials, Mr. Gogic may renew his motion to compel, provided that he specifically indicates for each item whether and when it was previously requested, and attempts to explain why he is entitled to its production under Rule 16. *See United States. v. Finnerty*, 411 F. Supp. 2d 428, 431 (S.D.N.Y. 2006) (explaining that, under Rule 16(a)(1)(E), "the burden is on the defendant[] to make a prima facie showing that the documents sought are material to preparation of the defense"). He is reminded, however, that "conclusory allegations are insufficient . . . to establish materiality," *id.*, and that Rule 16 does not entitle a defendant to discover "the entirety of the [g]overnment's case against him." *United States v. Percevault*, 490 F.2d 126, 130 (2d Cir. 1974). The government, of course, is required to continue complying with

its disclosure obligations and produce any *Brady* material in its possession "in time for its effective use at trial." *Coppa*, 992 F. Supp. 2d at 156.

## CONCLUSION

Mr. Gogic's motion to suppress and/or exclude evidence of the Sky ECC messages provided by French intelligence officers is denied. Mr. Gogic's motion to compel additional discovery is denied with the exception of any material pertaining to his own statements, which the government is ordered to produce to the extent such material exists.

SO ORDERED.

/s/
Allyne R. Ross
United States District Judge

Dated:       January 8, 2025
             Brooklyn, New York