UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

GORAN GOGIC,

                *Defendant.*

22-CR-493 (ARR)

**OPINION & ORDER**

ROSS, United States District Judge:

Defendant Goran Gogic is charged with coordinating the transport of more than 20 tons of cocaine by way of the United States, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501 *et seq.*. Mr. Gogic moves to suppress evidence obtained from his cell phone, which was seized by federal agents at the time of his arrest. An evidentiary hearing was held on February 14, 2025, at which Mr. Gogic and a federal agent testified about the circumstances in which the phone was seized and unlocked. For the following reasons, the motion is denied.

## BACKGROUND[1]

On October 28, 2022, a grand jury in this district returned a four-count indictment charging Mr. Gogic with one count of conspiracy to violate the MDLEA and three counts of substantive violations of the MDLEA, 18 U.S.C §§ 70503(a)(1), 70503(b), 70504(b)(2), 70506(a), 70506(b); 21 U.S.C. § 960(b)(1)(B)(ii). Two days later, on October 30, 2022, Mr. Gogic was scheduled to fly out of the Miami International Airport on a flight bound for Switzerland. Hr'g Tr. 112:17. When Mr. Gogic arrived at the airport that day, Homeland Security Investigation (HSI) agents, working in coordination with Customs and Border Patrol ("CBP"), were already planning to arrest him and prevent him from leaving the country. Hr'g Tr. 40:3–41:5. Mr. Gogic arrived in the airport in the evening, *id*. at 16:25 and went to the ticket counter with his friend, Errol Ceylan, with whom he was traveling, *id*. at 113:3. While they were standing in line, Mr. Gogic was approached by multiple CBP officers, who informed him that he was under arrest, placed him in handcuffs, seized his cell phone and identity documents, and transported him to a private room controlled by CSB and referred to as "secondary." *Id*. at 59:9–20; 70:8–15; 113:4–115:13; *see also* Def.'s Ex. R. ¶ 3, ECF No. 69-19 ("Gogic Decl."). Mr. Gogic testified that,

---

[1] The facts are taken from the parties' moving papers, Def.'s Mem. L. in Supp. Mot. to Suppress, ECF No. 69 ("Def.'s Mot."); Mem. L. in Opp'n to Mot. to Suppress, ECF No. 71 ("Gov't Opp'n"); Reply to Gov't Opp. to Mot. to Suppress, ECF No. 74 ("Def.'s Reply"); the exhibits accompanying those papers, ECF Nos. 69-18, 69-19, 69-20; the government's supplemental letter regarding the alleged Sixth Amendment violation, Letter in Further Opp'n to Motion to Suppress, ECF No. 78 ("Gov't Letter"); the transcript of the February 14, 2025 evidentiary hearing, Feb. 14, 2025 Hearing Transcript ("Hr'g Tr."); and post-hearing briefing, Def.'s Post-Hearing Mem. L. in Supp. Mot. Suppress, ECF No. 86 ("Def.'s Post-Hearing Mem."); Gov't Post-Hearing Letter, ECF No. 80. Additional facts are set forth in my previous Opinion & Order, ECF No. 79, familiarity with which is presumed.

before he was transported to secondary, he asked Mr. Ceylan to help him find an attorney, which Mr. Ceylan agreed to do. Hr'g Tr. 114:9–14.

Once Mr. Gogic arrived at secondary, CSB officers began post-arrest processing, at which point HSI learned that the arrest had been effectuated. *Id.* at 59:9–60:14. Approximately forty-five minutes later, four HSI agents—Michael Molina, Denis Kennedy, Michael Hernandez, and Alec Sorokin—arrived and took Mr. Gogic into HSI custody by switching his handcuffs. *Id.* at 18:9–19:24, 71:2–9. The agents walked Mr. Gogic to a conference room nearby for an interview. *Id.* at 19:22–20:20; 71:10–18. According to Agent Molina, who testified at the evidentiary hearing, the purpose of the HSI interview was to attempt to gain Mr. Gogic's cooperation. *Id.* at 24:3–5. Agent Molina's characterization is corroborated by Mr. Gogic's recollection that the agents repeatedly told him that they "wanted to help [him]" and asked if he was willing to cooperate. *Id.* at 116:9–11. According to contemporaneous notes taken by Agent Kennedy, the interview began at approximately 7:15 PM. Def.'s Ex. Q ("HSI Notes"), ECF No. 69-18. The interview was conducted entirely in English, though both Mr. Gogic and Mr. Molina also speak Spanish. Hr'g Tr. 78:14–23; 79:16–17; 121:11–123:1.

Agent Molina testified that the interview proceeded, in line with his general practice, as follows. First, he introduced himself and his partners and described the nature of the case. *Id.* at 24:18–20. Agent Molina then provided Mr. Gogic with an "Advice of Rights" form, which Agent Molina read aloud, pausing to ask if Mr. Gogic understood each paragraph. *Id.* at 24:21–27:9; *see also* Gov't Hr'g Ex. 1 ("Advice of Rights" form). Agent Molina testified that Mr. Gogic indicated that he did understand, though he asked for clarification or further explanation several times. *Id.* at 27:12–28:2. Mr. Gogic declined to sign the form, or to initial any individual paragraph. *Id.* at 26:7–14. A copy of

3

the Advice of Rights, which was signed by Agents Molina and Kennedy as "witnesses," was entered into evidence at the hearing. *Id.* at 25:5–26:14; Gov't Hr'g Ex. 1. The form also includes the handwritten phrase "refused to sign or initial" and lists the time as 7:20 PM. Hr'g Tr. at 26:7–8, 108:10–17. Agent Kennedy's notes generally corroborate Agent Molina's testimony, indicating that Mr. Gogic "stated that he understood after each advisement, but . . . refused to sign *Miranda* form . . . because he was uncomfortable signing something in another country if he did not fully understand the situation." HSI Notes; *see also* Hr'g Tr. 93:21–95:21 (discussing use of the word "uncomfortable" in HSI notes).

After reviewing the *Miranda* form, the agents proceeded to explain the investigation and the possibility of cooperation. *Id.* at 28:6–17; 90:12–91:24. The conversation lasted approximately thirty minutes. *Id.* at 90:17. Agent Molina testified that Mr. Gogic appeared to understand the substance of the conversation and that Mr. Gogic indicated that he was "not . . . the big guy," but might be able to help as a cooperator if allowed to return to Germany. *Id.* at 28:12–17; *see also* HSI Notes ("He stated that the only way he could get information was if agents allowed him to go to Germany but he would have to look for it."). When it became clear that Mr. Gogic was not "ready to cooperate" on terms that the government would allow, the agents ended the interview. Hr'g Tr. 29:1–8, 92:11–93:5. The agents communicated to Mr. Gogic that the opportunity to cooperate would still be available, and that Mr. Gogic could let them know after speaking with an attorney. *Id.* at 96:17–97:14. Agent Molina testified that Mr. Gogic never actually asked to speak with an attorney. *Id.* at 29:9–11; 97:15–98:23. According to Agent Kennedy's notes, the interview ended at approximately 7:45 PM. *Id.* at 109:11–12; HSI Notes.

4

After the HSI interview concluded, the agents returned Mr. Gogic to secondary for CBP to resume processing. Hr'g Tr. 29:12–15. Agent Molina testified that, before departing, he offered to help Mr. Gogic retrieve a phone number for a friend or loved one. *Id*. at 29:19–30:5; 32:20–24. Agent Molina testified that he routinely offers this courtesy to recent arrestees as a way of building rapport. *Id*. at 30:10–15. Agent Molina explained that sometimes he retrieves the number directly from "a loved one nearby" and sometimes he helps arrestees retrieve numbers from their cell phones. *Id*. at 29:24–30:19. For the latter option, Agent Molina testified that he always holds or operates the phone to ensure that the suspect does not endanger officer safety or destroy evidence contained on the phone. *Id*. at 31:4–15 In this case, Agent Molina testified that, after arriving at secondary, he offered to let Mr. Gogic unlock and operate Mr. Gogic's iPhone while Agent Molina held onto it. *Id*. at 32:20–24, 102:8–11; *see also* Gogic Decl. ¶ 10. Agent Molina testified that Mr. Gogic initially seemed "apprehensive" about revealing his passcode, but ultimately did unlock the phone and retrieved the phone number for Errol Ceylan, which Agent Molina transcribed for Mr. Gogic. Hr'g Tr. 33:1–9; 103:6–11. Agent Molina testified that he also observed and remembered the digits of iPhone passcode, which he communicated to another agent. *Id*. at 33:19–22. The passcode and Mr. Ceylan's number are recorded in Agent Kennedy's notes. HSI Notes; Hr'g Tr. 102:15–103:11. After Mr. Gogic retrieved the number, the agents allowed him to make a call using a different phone. *Id*. at 104:4–10. Agent Molina did not recall listening to the phone call but recalled that Mr. Gogic was speaking a language other than English. *Id*. at 104:22–105:4.

Mr. Gogic's testimony at the hearing generally corroborates Agent Molina's description of the encounter, except in the following ways. First, Mr. Gogic testified that a significant language barrier prevented him from understanding much of what the agents

said and from reading the Advice of Rights form that was provided to him. *See* Hr'g Tr. 111:15–112:7. Second, Mr. Gogic testified that he asked to speak with a lawyer near the start of the HSI interview and that the agents ignored that request. *Id*. at 115:22–116:24; 118:23–119:1; *see also* Gogic Decl. ¶ 7. Third, Mr. Gogic testified that he requested to call a friend, which precipitated Agent Molina's offer to let him use the cell phone, rather than Agent Molina offering to retrieve a number from him unprompted. Hr'g Tr. 119:2–9; Gogic Decl. ¶ 9. Finally, Mr. Gogic testified about the substance of the subsequent phone call, which Agent Molina could not recall. *See* Hr'g Tr. 104:4–105:1. Specifically, Mr. Gogic testified that he called Mr. Ceylan to ask about obtaining a lawyer and that Mr. Ceylan informed him on the phone that "an attorney [was] already in contact with airport police." *Id*. at 119:11–20; Gogic Decl. ¶ 13. At the hearing, Mr. Gogic entered into evidence a declaration from an attorney named Lawrence Abu-Hashish stating that, around 6:30 PM, he received a call from Mr. Ceylan informing him that Mr. Gogic required legal representation. *See* Hr'g Tr. 123:10–22. The declaration states that, within approximately fifteen minutes of receiving the call from Mr. Ceylan, attorney Hashish "began making phone calls to CBP to inform them that Mr. Gogic was represented by counsel, [and] invoked his right to remain silent[.]" Def.'s Hr'g Ex. A ¶ 3. Agent Molina testified that he was not aware at the time, nor on the date of the evidentiary hearing, that attorney Hashish had contacted CPB. Hr'g Tr. 105:10–13. Attorney Hashish was not mentioned in the moving papers, nor was he present at the hearing.

Following Mr. Gogic's arrest, HSI retained the iPhone, which was subsequently transported to New York. *See* Def.'s Ex. S, ¶ 11–12, ECF No. 69-20 ("Warrant Aff."). It remained in federal custody until an HSI agent sought a warrant to search its contents on February 26, 2024. *Id*. ¶¶ 4–5, 21. The affidavit in support of the warrant cited, as

6

probable cause for the search, the fact of Mr. Gogic's indictment, the 2019 narcotics seizures, the Sky ECC communications that were provided by the French government, and the tendency of cellphone users to generate evidence of their movement and identity that is stored on their devices. *Id*. at ¶¶ 6–13; *see* 2024 Op. & Order at 3–7, ECF No. 79 (describing Sky ECC evidence). In sum, the affidavit stated that there was "probable cause to believe that a search of the Device w[ould] reveal evidence of crime, including attribution evidence that corresponds to evidence from the Sky ECC data." *Id*. at ¶ 14. The warrant was granted by Magistrate Judge Cheryl Pollack. 24-MJ-174 (E.D.N.Y. issued Feb. 26, 2024). The agent used the passcode recorded in the HSI interview notes to unlock the iPhone. Hr'g Tr. 7:16–19.

At trial, the government plans to introduce evidence obtained from the iPhone that will corroborate Mr. Gogic's identity as a participant in incriminating communications on two Sky ECC accounts, which were associated with different devices. Gov't Opp'n 7–8. The evidence in question includes photographs and account information that purportedly matches those found in the Sky ECC communications. *Id*. at 8. Mr. Gogic moves to suppress all evidence from the iPhone as fruit of a violation of his Fifth and Sixth Amendment rights or, alternatively, because the February 2024 warrant was unsupported by probable cause. Def.'s Mot. 74–85.

## DISCUSSION

### I. Fifth Amendment

Mr. Gogic moves to suppress evidence from his iPhone on the grounds that his passcode was obtained during a custodial interrogation after he had invoked his right to counsel, in violation of the Fifth Amendment and *Edwards v. Arizona*, 451 U.S. 477 (1981). Def.'s Mot. 74–82. The motion is denied because the revelation of the passcode

was not the product of actual coercion, which is a prerequisite for suppressing derivative evidence under the Fifth Amendment.

### 1. Applicability of Edwards's presumption of coercion

The Fifth Amendment's Self-Incrimination Clause provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. That guarantee extends beyond verbal statements by the accused to other forms of "communication[] . . . that are 'testimonial' in character." *In re Grand Jury Proc.*, 971 F.3d 40, 55–56 (2d Cir. 2020) (quoting *United States v. Hubbell*, 530 U.S. 27, 34 (2000)); *see also Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004). The Fifth Amendment "appl[ies] with equal force to both citizens and foreigners who are haled into our courts to answer criminal charges." *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 200 (2d Cir. 2008).

Recognizing the "'inherently compelling pressures' of custodial interrogation," the Supreme Court has prescribed a series of "prophylactic" rules designed to buttress the right against self-incrimination in custodial settings. *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). These rules create a presumption that certain custodial communications are compelled unless conditions specified in the case law are met. *Id.* at 105. In *Miranda*, the Supreme Court announced that, before questioning a suspect in custody, police must warn the suspect of his right to remain silent and right to counsel. 384 U.S. at 467–73. If the suspect invokes those rights, the interrogation must cease unless and until the suspect makes a knowing, intelligent, and voluntary waiver. *Id.* at 473–75. In *Edwards*, the Supreme Court added a "second layer of prophylaxis" by raising the standard for waiver once a suspect has invoked his right to counsel. *Shatzer*, 559 U.S. at 104. Under *Edwards*, a subject who has invoked his

right to counsel cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself *initiates* further communication, exchanges, or conversations with the police." *Id.* (quoting *Edwards*, 451 U.S. at 484–85) (emphasis added). Incriminating statements obtained in violation of the prophylactic rules are presumed to be compelled and are therefore excluded for the purposes of the prosecution's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

The prophylactic rules set forth in *Miranda* and *Edwards* are "not themselves rights protected by the Constitution," but judicially created safeguards designed to "provide practical reinforcement for the right against compulsory self-incrimination." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974); *see also Shatzer*, 559 U.S. at 104–07. Accordingly, the prophylactic rules do not apply to non-testimonial derivative evidence. *See United States v. Patane*, 542 U.S. 630, 639 (2004) ([T]he *Miranda* rule does not require that the statements taken without complying with the rule and their fruits be discarded as inherently tainted." (cleaned up)); *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986) ("The *Miranda* presumption of coercion has not barred the use of unwarned, voluntary statements . . . to locate non-testimonial evidence[.]"). As the Supreme Court has explained, requiring the suppression of evidence identified through a voluntary, but un-*Mirandized* statement "could not be justified by reference to the Fifth Amendment goal of assuring trustworthy evidence or by any deterrence rationale." *Patane*, 542 U.S. at 639–40 (internal quotations omitted). Whether derivative evidence must be suppressed, therefore, depends on whether it was located as result of testimony that was "actually compelled." *Id.* at 639. "[W]ithout a showing of involuntariness," the remedy for a violation of *Miranda* or *Edwards* "is limited to the exclusion of an unlawfully

obtained statement and does not extend to the exclusion of derivative physical evidence." *United States v. Sultanov*, 742 F. Supp. 3d 258, 298 (E.D.N.Y. 2024).

Here, there is no dispute that Mr. Gogic was "in custody" and subjected to interrogation at the time of his arrest, *see* HSI Notes (documenting arrest and interview); *New York v. Quarles*, 467 U.S. 649, 655 (1984) (defining police custody), which means that *Edwards* would bar the introduction of any testimonial communications made after Mr. Gogic invoked his *Miranda* rights unless he initiated the conversation. However, the government does not seek to admit any communications from the interview itself—only the contents of his iPhone that were obtained as a result. Gov't Opp'n 8, 21–22. The "bright-line rule" of *Edwards*, which is invoked repeatedly in Mr. Gogic's briefing, is therefore inapposite. *See* Def.'s Mot. 75–77; Def.'s Post-Hearing Mem. 37. Because the only evidence in question is derivative non-testimonial evidence, suppression is warranted only if the passcode is considered an incriminating testimonial statement that was obtained through "actual coercion." *Elstad*, 470 U.S. at 309; *Morales*, 788 F.2d at 886.

### 2. *Fifth Amendment principles and cell phone credentials*

Courts in the Second Circuit have split on the question of when and whether cell phone credentials are testimonial statements that qualify for Fifth Amendment privilege. *See United States v. Eldarir*, 681 F. Supp. 3d 43, 50–52 (E.D.N.Y. 2023); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 314–15 (S.D.N.Y. 2024); *United States v. Smith*, 706 F. Supp. 3d 404, 408 (S.D.N.Y. 2023); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 310–11 (S.D.N.Y. 2018); *United States v. Gray*, No. 21-CR-713, 2024 WL 1526368, at *2 (S.D.N.Y. Apr. 9, 2024); *see also United States v. Hearst*, No. 18-CR-054 2022 WL 16832834, at *21 (N.D. Ga. Mar. 10, 2022) (collecting cases from other circuits), *R. & R.*

10

*adopted by* 2022 WL 8163946. Having reviewed those cases, I conclude that the revelation of a passcode from a suspect's mind or memory is testimonial in character. Unlike biometric credentials, such as facial recognition or a fingerprint, the revelation of a passcode requires the accused to reveal "the contents of his mind." *Doe v. United States*, 487 U.S. 201, 210 n.9 (1988). *Cf. Eldarir*, 681 F. Supp. 3d at 50–51 (analyzing fingerprint authentication). Drawing on the canonical distinction between "telling an inquisitor the combination to a wall safe" and "being forced to surrender the key to a strongbox," *United States v. Hubbell*, 530 U.S. 27, 43 (2000), I am persuaded that a passcode is "the modern-day equivalent of a wall safe," *Gray*, 2024 WL 1526368, at *3, contrary to the government's characterization. Gov't Opp'n at 21 ("[D]isclosure of a password [is] analogous to the production of a physical key[.]"). It is no matter that the passcode was not "*directly* or *inherently* self-incriminating," as it led to incriminating evidence stored on the iPhone. *United States v. Greenfield* , 831 F.3d 106, 127 (2d Cir. 2016); *see also Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (per curiam) ("The Fifth Amendment . . . privilege not only extends to answers that would in themselves support a conviction, but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." (citation and internal quotations omitted)).

Further, I do not believe the passcode falls within the "foregone conclusion" exception to act-of-production privilege, *see Fisher v. United States*, 425 U.S. 391, 411 (1976), though I agree with Judge Liman that it is a "closer question" not clearly controlled by precedent. *See Shvartsman*, 722 F.Supp. 3d at 316. Historically, the foregone conclusion exception applies where the government subpoenas specific documents, the existence, possession, and authenticity of which are already known by the government. *See Hubbell*, 530 U.S. at 44; *Greenfield*, 831 F.3d at 115–19. The logic for the exception is

that, where the existence and location of the documents is already known, the "act of producing them" has no testimonial significance because it "adds little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411. Some district courts have extended this logic to the production of passcodes where the government knows that the defendant is the owner of the phone and knows how to unlock it. *See, e.g.*, *Smith*, 706 F. Supp. 3d at 409; *United States v. Cheng*, No. 20-CR-455, 2022 WL 112025, at *9 (S.D. Tex. Jan. 12, 2022). However, neither the Supreme Court nor the Second Circuit has applied the foregone conclusion exception outside the context of document production. And even in this context, the doctrine has been criticized by various justices as an erosion of the scope of the Self-Incrimination Clause by forcing a defendant "assist the [g]overnment in developing its case" against him. *Doe*, 487 U.S. at 220 (Stevens, J., dissenting); *see also Hubbell*, 530 U.S. at 49 (Thomas, J., concurring); *Fisher*, 425 U.S. at 415 (Brennan, J., concurring). Until a higher court clearly instructs that the foregone conclusion exception applies beyond document production, I decline to extend it to the context of cell phone credentials. Doing so would, in my view, obviate the longstanding doctrinal distinction between the key and the combination to a safe. *See Hubbell*, 530 U.S. at 43; *United States v. Booker*, 561 F. Supp. 3d 924, 935 n.2 (S.D. Cal. 2021).

### 3. Application

Nonetheless, I conclude that Mr. Gogic's passcode was not obtained in violation of the Fifth Amendment because his actions were not "compelled." A communication is compelled when it is "not made voluntarily" because the "defendant's will was overborne." *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) (citations and internal quotations omitted). Voluntariness is assessed based on the "totality of the circumstances, including (1) the characteristics of the accused, (2) the conditions of interrogation, and

(3) the conduct of law enforcement officials." *Id.* at 352 (citation and internal quotations omitted).

Much of the testimony elicited at the hearing focused on Mr. Gogic's characteristics—namely his ability to understand what was being communicated by the HSI agents. The evidence supports the government's position that Mr. Gogic's comprehension of English was sufficient for him to understand what the agents were communicating. *See* Gov't Post-Hearing Letter 4–5. Mr. Gogic testified that he can only speak and read English "a little bit," and that he was not able to read the *Miranda* waiver that was presented to him. Hr'g Tr. 111:22–25; 117:16–24. Agent Molina acknowledged that there was "sometimes . . . a word or phrase [Mr. Gogic] didn't understand," but that the agents were able to provide clarification where needed. *Id.* at 27:18–28:15. Agent Molina testified that he could tell Mr. Gogic understood the conversation based on Mr. Gogic's ability to answer questions appropriately, *id.* at 27:16–17, and offered examples from the conversation that demonstrate as much, *see id.* at 28:11–17. Agent Molina's recollection is corroborated by Agent Kennedy's notes, HSI Interview Notes ("GG stated that he understood after each advisement"), and by Mr. Gogic's own testimony, during which he accurately recounted the topics discussed in the interview, including the nature of the charges against him, the relevance of drug shipments and European contacts, the fact that the agents were interested in securing his cooperation, and the offer to use his phone to obtain contact information for his friend. *See id.* 115:19–116:11, 121:11–123:1. The fact that Agent Molina never attempted to speak to Mr. Gogic in Spanish, *id.* at 77:3–4; 79:12–17, provides further evidence of Mr. Gogic's comprehension. Agent Molina credibly testified that his goal in the interview was to "cultivate cooperation," *id.* at 24:3–5, and that he knew at the time that Mr. Gogic spoke Spanish, *id.* at 77:3–4. It is

improbable that Agent Molina would not switch to speaking Spanish, and forego effective communication with a potential cooperator, unless the conversation was proceeding well in English.

As for the conditions of the interrogation, *Kourani*, 6 F.4th at 352, there is nothing about the location or duration of the interview that is suggestive of coercion. According to HSI records, which were entered into evidence at the hearing, the interview lasted approximately thirty minutes and occurred in a conference room inside the airport. *See* Hr'g Tr. 108:13–109:12; 20:11–12. There is "no evidence that [Mr. Gogic] was denied food, access to the bathroom, or sleep during his interrogation." *Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996). To the contrary, the agents intentionally tried to cultivate an atmosphere that was calm and friendly—a fact that Mr. Gogic acknowledged in his testimony. Hr'g Tr. 23:13–24, 115:25 ("[The agents] were friendly and kind").

Finally, all evidence of the agents' conduct supports the conclusion that Mr. Gogic revealed his passcode voluntarily. It is undisputed that the passcode was revealed at the end of the interview, after the discussion about the charges and the possibility of cooperation. According to Agent Molina, he was the one who offered to let Mr. Gogic to retrieve the cell phone number as a way of building rapport—a tactic he has used "dozens of times" with different defendants. *Id*. at 29:19–30:12, 32:16–19. Agent Molina testified that, when he made the offer, Mr. Gogic initially seemed "apprehensive" about revealing the code. *Id*. at 33:1–2. In response, Agent Molina "reiterated that . . . it's up to you but I'm going to hold the phone." *Id*. at 33:3–4. Mr. Gogic then elected to unlock the phone, and Agent Molina helped him write down a number. *Id*. at 33:5–9. According to Mr. Gogic, he was the one who requested to use his phone to "call [his] friend and ask him to secure an attorney for me." *Id*. at 119:4–5. Mr. Gogic further testified that the agents then

14

"brought [his] phone from somewhere" and told him to "enter your code here and open your phone." *Id.* at 119:8–14. Mr. Gogic did not testify that Mr. Molina forced, or even encouraged, him to enter the passcode—merely that he was given the option in response to his request to make a call. *Id.*; *see also* Gogic Decl. ¶¶ 9–10. Regardless of who introduced the idea of using the iPhone to obtain a number, there is no evidence that HSI applied any pressure, threatened adverse consequences, or misrepresented the situation in order to encourage Mr. Gogic to enter the passcode.

The crux of Mr. Gogic's argument is that the revelation of the passcode was compelled because he believed that doing so was the only way for him to obtain an attorney. Hr'g Tr. 120:11–15; Gogic Decl. ¶ 11 ("I understood this to mean that if I wanted an attorney, I had no other choice but to use my passcode in front of the agents[.]"). This argument is unpersuasive for several reasons. First, Agent Molina provided testimony, corroborated with documentary evidence, that he read aloud the Advice of Rights form which set forth "the right to talk to a lawyer," and which Mr. Gogic indicated that he understood. Hr'g Tr. 24:23–25:21; 27:1–9; Gov't Hr'g Ex. 1 ("Advice of Rights" form); HSI Notes. In light of that testimony, I find Mr. Gogic's claim that the agents said *nothing* about the availability of a lawyer, Hr'g Tr. 116:21–24; 118:16–119:1, not credible. Second, Mr. Gogic himself testified that he understood when the agents read the Advice of Rights form that he was "being told about his ability to have a lawyer." *Id.* at 118:16–18. In post-hearing briefing, defense counsel claims that the particular phrasing of the form was unclear to him.[2] *See* Def.'s Post-Hearing Mem. 34, 37 n.87. This claim is unsupported by

---

[2] The advisement at issue states "You have the right to talk to a lawyer before we ask you any questions and to have a lawyer present during our questioning, even if you cannot afford a lawyer." Gov't Hr'g Ex. 1. Defense counsel argues that this language does not clearly communicate that a lawyer would be "provided." Def.'s Post-Hearing Mem. 24.

the testimony, and contradicted by the fact that Mr. Gogic did not ask for any clarification regarding the timeline or process for obtaining counsel. Finally, even if Mr. Gogic did mistakenly believe that his access to counsel depended on being able to contact Mr. Ceylan, *id*. at 120:11–15, there is no evidence that the HSI agents led him to that conclusion. To the contrary, Agent Molina told Mr. Gogic that the door to cooperation would remain open after Mr. Gogic spoke with an attorney. *Id*. at 97:18–98:23. A direct reference to Mr. Gogic's forthcoming communication with counsel is incompatible with the inference that the agents misled him regarding his rights. "To prevail on a claim of involuntariness premised on trickery and deception, a defendant must produce clear and convincing evidence that the government agents affirmatively misled him as to the true nature of their investigation." *Kourani*, 6 F.4th at 351 (cleaned up). "Inculpatory statements are not involuntary when they result from . . . a defendant's ignorance of, or inattention to, his right to remain silent." *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992).

In sum, the totality of the circumstances demonstrate that Mr. Gogic revealed his passcode to Agent Molina voluntarily. I do not doubt that, when presented with the opportunity to access his phone, Mr. Gogic confronted a tough choice between safeguarding his passcode and contacting his friend. However, there is simply no evidence that, in presenting him with that choice, his "will was overborne." *Kourani*, 6 F.4th at 351.

## II.  Sixth Amendment

Mr. Gogic also moves to suppress the evidence from his iPhone on the grounds that his passcode was obtained in violation of his Sixth Amendment right to counsel. Def.'s Mot. 82. I deny the motion because Mr. Gogic has not established that the HSI agents acted in a manner that was deliberately designed to elicit the passcode.

16

1. *Legal Principles*

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence.'" *United States v. Mills*, 412 F.3d 325, 328 (2d Cir. 2005) (quoting U.S. Const. amend. VI). The right attaches at "the initiation of adversary judicial criminal proceedings—whether by way of indictment or information." *Id.* Once the right has attached, it "imposes on the government an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel." *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993). Incriminating statements that are "deliberately elicited from a defendant without an express waiver of the right to counsel" are inadmissible. *Michigan v. Harvey*, 494 U.S. 344, 348 (1990) (quotations omitted). "[To] make out a violation of [the Sixth Amendment right to counsel] . . . . the defendant must demonstrate that [the government] took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). Derivative evidence obtained through a Sixth Amendment violation is generally inadmissible under the "fruit of the poisonous tree" doctrine. *Nix v. Williams*, 467 U.S. 431, 442 (1984) (quotations omitted); *see also United States v. Reyes*, 934 F. Supp. 546, 550 (S.D.N.Y. 1996).

The Supreme Court has "expressly distinguished" the Sixth Amendment deliberate-elicitation standard "from the Fifth Amendment custodial-interrogation standard." *Fellers v. United States*, 540 U.S. 519, 524 (2004). For one, the two standards focus on different parties. "[T]he Fifth Amendment's interrogation inquiry . . . focuses 'primarily upon the perceptions of the suspect,'" while the Sixth Amendment focuses on the "*intention*[]" of the government officials. *United States v. Rommy*, 506 F.3d 108, 135

(2d Cir. 2007) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The two standards may also apply in different factual contexts. The Fifth Amendment bars police from coercing incriminating statements at any stage of an investigation, *Mara v. Rilling*, 921 F.3d 48, 77 (2d Cir. 2019), whereas the Sixth Amendment applies only after criminal proceedings have been "initiated" and "the adverse positions of government and defendant have solidified," *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (citations and internal quotations omitted). There are also "classic situations where the Sixth, but not the Fifth, Amendment protections apply," such as "where a prison informant somehow importunes a defendant to make incriminating statements." *Rommy*, 506 F.3d at 136.

While many courts have grappled with the application of the Self-Incrimination clause to cell phone credentials, *see Shvartsman*, 722 F. Supp. 3d at 315 (collecting cases), most have lacked occasion to apply the Sixth Amendment deliberate-elicitation standard, as the defendants in those cases were questioned before their right to counsel attached. *See, e.g.*, *id.* at 305–306; *Pinto-Thomaz*, 357 F. Supp. 3d at 337; *United States v. Clark*, 683 F. Supp. 3d 97, 105 (D. Mass. 2023); *United States v. Hooton*, No. 21-CR-105, 2023 WL 3582029, at *2 (E.D. Cal. May 22, 2023); *United States v. Booker*, 561 F. Supp. 3d 924, 937 (S.D. Cal. 2021). I am aware of only one federal case from the Northern District of California applying the deliberate elicitation standard to the revelation of a cell phone passcode. *See United States v. Maffei*, No. 18-CR-174, 2019 WL 1864712, at *9–10 (N.D. Cal. Apr. 25, 2019). In that case, a federal agent approached the defendant in a holding cell, after she had been arrested and charged by way of a criminal complaint, and "informed [her] that he was there to get the passcodes for [her] phones," which the defendant then shared. *Id.* at *2–3. The court declined to suppress the contents of the phone under the Fifth Amendment because the defendant's response was "not

*compelled*," *id.* at \*7, but concluded that the government *did* violate the defendant's Sixth Amendment right to counsel "by approaching defendant after the initiation of formal proceedings, and after defendant had unequivocally invoked her right to counsel, and stating 'that he was there to get the passcode for the phones,'" *id.* at \*10. The court suppressed all evidence obtained during, or derived from, the subsequent search of the cell phone. *Id.*

### 2. Application

There is no doubt that Mr. Gogic's Sixth Amendment right to counsel had attached at the time of the interrogation, which occurred two days after his October 28, 2022 indictment. *See* Hr'g Tr. 40:15–19; *Rosa*, 11 F.3d at 329. For the reasons set forth in section I.2, I conclude that the revelation of the passcode was an "incriminating statement," *Moulton*, 474 U.S. at 176, for the purpose of the Sixth Amendment.[3] Based on the evidence adduced—namely Mr. Gogic's refusal to sign the *Miranda* waiver, Hr'g Tr. 88–89; Gov't Hr'g Ex. 1, I cannot conclude (nor does the government argue) that Mr. Gogic expressly waived his right to counsel. *Rommy*, 506 F.3d at 135. The remaining question, then, is whether Agent Molina deliberately elicited the passcode.

Deliberate elicitation occurs only where the government takes some action that is "designed" to draw forth incriminating remarks. *Rosa*, 11 F.3d at 329. That definition

---

[3] Notwithstanding lexical differences, I am not aware of any authority distinguishing between a "communication" that is "testimonial [and] incriminating" for the purpose of the Fifth Amendment, *Hiibel*, 542 U.S. at 189, and an "incriminating statement[]" for the purpose of the Sixth Amendment, *Fellers*, 540 U.S. at 525. Nor have the parties asked me to draw such a distinction. Accordingly, in discussing the distinction between the Fifth and Sixth Amendment, I focus only on the difference between coercion and "deliberate elicitation." *See Rommy*, 506 F.3d at 136 (discussing the differences between "the deliberate elicitation inquiry from the custodial interrogation inquiry").

encompasses not only "affirmative interrogation," *United States v. Henry*, 447 U.S. 264, 271 (1980), in which an officer poses direct questions to "prompt" the disclosure of incriminating information, *Rommy*, 506 F.3d at 136, but also non-interrogatory words and conduct "whose *purpose* [is] to obtain an incriminating statement." *United States v. Escalera*, 279 F. Supp. 3d 449, 453 (W.D.N.Y. 2017). The intent of the government's agent is key, as the Sixth Amendment "is not violated by the merely fortuitous receipt of incriminating statements." *Rosa*, 11 F.3d at 329; *see also Moulton*, 474 U.S. at 176.

The two witnesses outlined slightly different versions of the interaction that led to the revelation of the passcode. Both testified that (1) Mr. Gogic expressed interest in handling his phone to facilitate communication with a friend, and (2) that an agent subsequently brought him the device and held it up for him to enter his passcode. *See* Hr'g Tr. 32:20–33:9; 102:1–11; 119:2–14. Their accounts differed, however, on the narrow question of who first mentioned the prospect of retrieving the number.[4] *Id*. I see no need to determine which witness's account is accurate with respect to that small detail, as neither version demonstrates deliberate elicitation.

According to Mr. Gogic's testimony, the agents presented the phone for him to unlock after he asked to make a call to his friend.[5] Hr'g Tr. 119:2–14; *see also* Gogic Decl. ¶¶ 9–10 ("I then asked the agents if I could call" and "[o]ne of the agents told me that they

---

[4] In post-hearing briefing, Mr. Gogic acknowledges the discrepancy, *see* Def.'s Post-Hearing Mem. 29, 37, but does not take a clear position on which account is accurate, referring vaguely to the officers "directing Mr. Gogic to enter the passcode," *id*. at 45. Since Mr. Gogic's factual position is unclear to me, I discuss both versions and explain why his Sixth Amendment claim fails regardless.

[5] Notably, Mr. Gogic's written submissions make no attempt to reconcile Mr. Gogic's statement that he was the one who requested to call his friend with the fact that the Sixth Amendment concerns disclosures that are solicited by the government. *See Rommy*, 506 F.3d at 135; *Rosa*, 11 F.3d at 329.

would let me use my iPhone to get the phone number"); Def.'s Mot. 50. Mr. Gogic further testified that, after the agents retrieved his phone, they instructed him to "enter your code here and open your phone . . . [and] pull out the number that belong[s] to [your] friend." Hr'g Tr. 119:10–12. On this account, the agents merely acceded to Mr. Gogic's request and learned the passcode as a fortunate byproduct. Taking his testimony as true, Mr. Gogic has not met his burden of "demonstrating the basis for the motion," *United States v. Sultanov*, 742 F. Supp. 3d 258, 279 (E.D.N.Y. 2024), as the Sixth Amendment is not violated by incriminating revelations that occur through "luck or happenstance." *Moulton*, 474 U.S. at 176.

The question is somewhat closer if I accept Agent Molina's version of events, as he testified that he was the one who initiated the discussion about obtaining a phone number from the iPhone. Hr'g Tr. 32:20–24; 102:7 ("I don't recall [Mr. Gogic] asking to use a phone."). Nonetheless, I would still find that there was no deliberate elicitation based on the agent's credible testimony that his conduct had a permissible purpose.

During the evidentiary hearing, Agent Molina testified that the cases he works are "cooperator-driven," and that his goal in most interviews is "trying to gain . . . the person's cooperation[.]" *Id*. at 23:13–24:5. Accordingly, he testified that he generally tries to cultivate an atmosphere of "calm" and extends small courtesies such as providing snacks and water, *id*. at 23:1–17, and offering arrestees the "opportunity to retrieve phone numbers" before they are booked in jail, *id*. at 29:19–30:15. He explained that, in his experience, offering to retrieve phone numbers "goes a long way for [building] rapport" with people who are in a "difficult situation." *Id*. at 29:21–30:15. Agent Molina further testified that he never lets arrestees handle their phone privately, and instead holds the phone himself. *Id*. at 31:4–6. He provided a credible and reasonable explanation for

imposing such restrictions—namely that a defendant could "attempt to delete or corrupt any evidence that may be in the phone." *Id.* at 21:10–11. He explained that, in the process of monitoring suspects' phone use, he sometimes "see[s] and remember[s] the pass code" that is entered, but stated that learning the passcode was not the "primary purpose of letting them use the phone[.]" *Id.* at 32:7–12. Agent Molina testified that, on October 30, 2022, he gave Mr. Gogic "an opportunity to look through his phone while [Agent Molina] held onto it," consistent with his usual practice. *Id.* at 32:20–33:24. Agent Molina testified that Mr. Gogic seemed "initially a bit apprehensive," *id.* at 33:1–2, but ultimately accepted the offer and retrieved a phone number that Agent Molina helped him write down, *id.* at 33:5–9. During this process, Agent Molina saw Mr. Gogic's passcode and "gave it" to another agent. *Id.* at 33:19–22

On cross, the defense did not impeach or otherwise inquire about Agent Molina's stated purpose for offering to let Mr. Gogic retrieve the phone number, nor his rationale for retaining control of the device. *See id.* at 101–106 (cross examination regarding offer to use cell phone). In post-hearing briefing, however, the defense argues that Agent Molina's stated purpose was pretextual since he could have facilitated the retrieval of a phone number directly from Mr. Ceylan, who was still in the airport at the time.[6] *See* Def.'s Post-Hearing Mem. 45–46. I find this suggestion unpersuasive and impractical for

---

[6] At the hearing, Mr. Gogic adduced evidence that an attorney purporting to represent Mr. Gogic called the airport around the time of the interrogation. *See* Hr'g Tr. 123:10–124:19; Def.'s Hr'g Ex. A (Decl. of Lawrence AbuHashish). However, there is no evidence that Agent Molina was aware of attorney Hashish's calls. *See id.* ¶ 3 (indicating only when attorney "began making phone calls to CBP," but not whether or when he spoke to an agent); Hr'g Tr. 105:10–106:12. In post-hearing briefing, the defense discusses attorney Hashish only as corroboration for Mr. Gogic's testimony that he asked Mr. Ceylan to contact a lawyer. *See* Def.'s Post-Hearing Mem. at 32, 36. As such, the evidence related to attorney Hashish does not impact my analysis of Agent Molina's purpose.

several reasons. First, there is no evidence that Agent Molina knew, prior to the unlocking

of the phone, that Mr. Gogic was hoping to retrieve Mr. Ceylan's number specifically.

Second, there is no evidence that Agent Molina knew where in the airport Mr. Ceylan was

located, or whether he was still in the airport at all. *See* Gov't Post-Hearing Letter 4. To

the contrary, I found Agent Molina's explanation to be credible, especially given Mr.

Gogic's corroborating testimony that the agents told him "that they wanted to help [him]"

and inquired about his willingness to cooperate. Hr'g Tr. 116:9–11. While I do not believe

that Agent Molina's actions were primarily motived by altruism, *see id*. at 30:12–14 ("I

think it is the right thing to do."), I do believe they were motivated by his desire to foster

cooperation—a goal that is obviously aided by the extension of small courtesies to a

subject in custody. In the absence of evidence that undermines Agent Molina's testimony

about his rationale for allowing Mr. Gogic to unlock the phone, I cannot conclude that his

purpose was anything other than the strategic cultivation of goodwill, and that the

acquisition of the passcode was mere good fortune.

　　　In sum, I would find that the HSI agents did not act with the purpose of obtaining

Mr. Gogic's passcode, regardless of who first suggested that he be permitted to unlock the

phone. On Mr. Gogic's account, the agents merely acceded to his request to use his phone.

On Agent Molina's account, the revelation and subsequent recording of the code were

incidental to his attempt to build rapport with Mr. Gogic by offering to help him retrieve

a phone number. In either case, the facts of this case are very different from *Maffei*, in

which the agent directly asked the defendant for her passcode for the sole purpose of

unlocking the device pursuant to a warrant. 2019 WL 1864712, at *9–10. The motion to

suppress is, therefore, denied.

## III.    Probable Cause

Alternatively, Mr. Gogic moves to suppress the iPhone evidence on the grounds that the warrant to search the iPhone was not supported by probable cause. Def.'s Mot. 82–84. Because the magistrate had a substantial basis for concluding that the iPhone would contain evidence linking Mr. Gogic to incriminating communications on the Sky ECC accounts, the motion is denied.

"The Fourth Amendment protects persons against 'unreasonable searches and seizures' by requiring that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. Daskal*, 676 F. Supp. 3d 153, 161 (E.D.N.Y. 2023) (quoting U.S. Const. amend. IV). To establish "probable cause," the information provided in the application must establish a "sufficient nexus" between the alleged crime and the place or object to be searched. *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004); *see also United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (explaining that the "required nexus . . . protects against the issuance of general warrants"). "Probable cause exists when the totality of the circumstances indicate that it is reasonably likely that evidence of a crime will be found in a given place." *United States v. An*, 733 F. Supp. 3d 77, 99 (E.D.N.Y. 2024); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983). "A failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992). To satisfy the particularity requirement, a warrant must meet three criteria: "(1) it must identify the specific offense for which the police have established

probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (citation and internal quotation marks omitted). In assessing the validity of a warrant "after-the-fact," I accord "substantial deference" to "the magistrate's finding of probable cause." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). My "duty" is "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993).

Here, Magistrate Judge Pollack clearly had a substantial basis for concluding there was probable cause that evidence of Mr. Gogic's involvement in narcotics trafficking would be found on the iPhone. *See An*, 733 F. Supp. at 99. The affidavit explains that, at the time the warrant was sought, the government had already obtained "voluminous records" of incriminating communications, including messages about narcotics trafficking, that were intercepted on the Sky ECC network. Warrant Aff. ¶ 9. Evidence corroborating that Mr. Gogic was a participant in those communications is clearly relevant to the drug trafficking and conspiracy charges against him. *See United States v. Weigand*, 482 F. Supp. 3d 224, 241 (S.D.N.Y. 2020) ("The charged crime is conspiracy, so communications with alleged co-conspirators, and evidence regarding such communications, is directly relevant.").

The crux of Mr. Gogic's argument is that the warrant describes several categories of evidence, such as photographs and travel information, that are not directly related to drug trafficking. *See* Def.'s Mot. 83–84. This argument misunderstands the meaning of probable cause, which merely requires a reasonable belief that the search may yield something that is "*useful as evidence* of a crime," *Texas v. Brown*, 460 U.S. 730, 742

(1983) (emphasis added), not that it will reveal a smoking gun. *See Weigand*, 482 F. Supp. 3d at 241 ("[The government is not required to] show that *these very devices* were used for conspiratorial communications in order to justify searching them."); *United States v. Skyfield*, No. 23-CR-569, 2023 WL 8879291, at *15 (S.D.N.Y. Dec. 22, 2023) (explaining how photo evidence on phone might "corroborate the Government's theory"). Given the particular facts of this case and the central role of the Sky ECC data, *see* 2024 Op. & Order at 3–6, I have no trouble understanding how the categories of evidence identified in the warrant would be useful to establishing that Mr. Gogic committed the charged offenses. This is not a case where the affidavit relied solely on the "notion that . . . anyone engaged in conspiratorial criminal activity would likely use his cellphone in connection with or to facilitate that criminal activity." *United States v. Silva*, No. 22-CR-347, 2024 WL 3488305, at *6 (S.D.N.Y. July 19, 2024). Rather, the affidavit identified specific pieces of "attribution evidence" in the Sky ECC communications, Warrant Aff. ¶ 10, for which the officer was seeking corroboration to "further tie [Mr.] Gogic to the Sky Phones," *id*. ¶ 13.

For similar reasons, I conclude that warrant was also sufficiently particular.[7] The first two particularity requirements—(1) to identify an offense for which there was probable cause and (2) describe the specific place to be searched, *Purcell*, 967 F.3d at 178—are easily satisfied by the warrant's identification of the device's serial number and the specification, in the document incorporated by reference, to the crimes charged in the indictment. *See* Warrant Aff., Attach. A. The third requirement—to specify the relationship between the iPhone and the designated crimes, *Purcell*, 967 F.3d at 178—is

---

[7] While Mr. Gogic does not use the word "particularity" in his motion, *see* Def.'s Mot. 82–84, he describes the warrant as authorization of a "fishing expedition," *id*. at 82. I interpret that passage as an argument that the warrant fails to establish the "relation" between the "item[] to be seized" and the "designated crimes." *Purcell*, 967 F.3d at 178.

satisfied by the warrant's specification of seven categories of evidence that would, help "link" Mr. Gogic to the crimes by corroborating his identity as a participant in Sky ECC communications. *See* Warrant Aff., Attach. B. That list includes contact information for individuals involved in drug trafficking, information about Mr. Gogic's travel schedule, and photographs of "distinctive locations, objects, events, and persons." *Id*. at ¶ 1. "Courts in this circuit routinely uphold similar warrants against similar particularity challenges when the challenged warrants permit the collection of evidence illustrated by a list related to a set of federal offenses." *United States v. Kidd*, 386 F. Supp. 3d 364, 374–75 (S.D.N.Y. 2019), *aff'd*, 2023 WL 7290904 (2d Cir. Nov. 6, 2023); *see, e.g.*, *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

## CONCLUSION

For the foregoing reasons, Mr. Gogic's motion to suppress evidence from his iPhone is denied in its entirety.

SO ORDERED.

/s/_____
Allyne R. Ross
United States District Judge

Dated:      March 17, 2025
            Brooklyn, New York