FJN:RMP/NDB
F. #2022R00883/NY-NYE-865

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -                   Docket No. 22-CR-493 (JMA)

GORAN GOGIC,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTIONS IN LIMINE

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Robert M. Pollack
Nomi D. Berenson
Assistant U.S. Attorney
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 2

    I.     The Offense Conduct.................................................................................................. 2

    II.    The Sky Data ............................................................................................................ 3

ARGUMENT ........................................................................................................................... 8

    I.     The Court Should Admit Evidence of the Defendant's Communications
          Over the Sky Network .............................................................................................. 8

    II.    The Court Should Admit Evidence of Uncharged Drug Trafficking
          as Direct Evidence, Inextricably Intertwined with the Charged
          Conspiracy and/or as Admissible "Other Crimes, Wrongs or Acts"
          Under Rule 404(b) ................................................................................................. 13

    III.   The Court Should Admit Statements of the Defendant and His
          Co-Conspirators, When Offered by the Government ........................................... 17

          A.    Defendant Statements Are Admissible When Offered by the
                 Government..................................................................................................18

          B.    Co-Conspirator Statements Are Admissible When Offered by
                 the Government............................................................................................20

    IV.   In the Event the Parties Do Not Enter Stipulations, the Court Should
          Allow the Government to Authenticate Certain Documents and
          Records by Certification ........................................................................................ 22

    V.    The Court Should Preclude All Testimony and Argument Relitigating
          Suppression Issues or Otherwise Suggesting that Any Evidence Was
          Obtained Unlawfully............................................................................................... 25

    VI.   The Court Should Preclude the Defendant's Proposed Expert Testimony
          to the Extent its Purpose Is to Relitigate Suppression Issues or Otherwise
          Suggest that Any Evidence Was Obtained Unlawfully ....................................... 26

          A.    *Daubert* .....................................................................................................27

          B.    Admissibility Under Rules 702, 402, and 403 ..........................................28

          C.    The Court Should Preclude the Proffered Testimony As
                 Unreliable and Offered by Unqualified Witnesses, Irrelevant,
                 and Unfairly Prejudicial..............................................................................29

    VII.  The Court Should Preclude Evidence and Argument Concerning
          Possible Punishment and Collateral Consequences.............................................. 31

CONCLUSION....................................................................................................................... 33

i

PRELIMINARY STATEMENT

The defendant, Goran Gogic, is charged with one count of conspiracy to violate the Maritime Drug Law Enforcement Act ("MDLEA") and three substantive counts of violating the MDLEA, in violation of Title 46, United States Code, Sections 70503(a)(1), 70503(b), 70504(b)(2), 70506(a) and 70506(b), and Title 21, United States Code, Section 960(b)(1)(B)(ii). Jury selection is set to begin on October 14, 2025, with trial to follow thereafter.

In advance of trial, the government respectfully moves *in limine* and requests that the Court:

(1) admit evidence of the defendant's communications over the encrypted messaging application Sky ECC (or "Sky"), which were obtained from the French government pursuant to the U.S./France Mutual Legal Assistance Treaty ("MLAT");

(2) admit evidence of uncharged drug trafficking and closely related crimes as direct evidence inextricably intertwined with the charged conspiracy and/or, in the alternative, pursuant to Rule 404(b) of the Federal Rules of Evidence ("FRE");

(3) admit statements of the defendant and his co-conspirators, when offered by the government, as opposing party statements and/or statements of co-conspirators in furtherance of the conspiracy;

(4) permit the government to authenticate certain documents and records by certification;

(5) preclude all testimony and argument attempting to relitigate issues that were decided in the denial of the defendant's suppression motion, or which

1

otherwise tend to suggest to the jury that any evidence was obtained unlawfully;

(6) preclude proffered expert testimony to the extent it concerns the European law enforcement operation that led to the seizure of the Sky evidence, European law and litigation related to that operation, the Sky data seized therein, and/or its admissibility in other courts; and,

(7) preclude all testimony and argument about potential penalties or collateral consequences of conviction.

BACKGROUND[1]

## I.    The Offense Conduct

The government anticipates that the evidence at trial will prove that the defendant was a major international narcotics trafficker who conspired with numerous others to smuggle huge quantities of cocaine from South America to the United States and Europe in commercial container ships—routinely moving hundreds and sometimes even thousands of kilograms of cocaine at a time.  Members of the conspiracy loaded cargo ships at sea under cover of darkness, near the coast and ports of Colombia, Ecuador, and Peru.  Corrupt crewmembers used the ships' cranes and nets to hoist loads of cocaine from speedboats that approached the ships at multiple points along their routes.  Once the cocaine was onboard, crewmembers hid it in specific shipping containers that they knew had room to conceal the large quantities of cocaine and for which they had prepared counterfeit container seals so that they could re-seal them after loading

---

[1]    For the convenience of the Court, the government summarizes the anticipated evidence in substantially similar form as stated in the government's opposition to the defendant's suppression motion (which was denied in its entirety).  The government does not purport to recite here all the evidence that it intends to offer at trial.

2

them with cocaine.  They selected specific containers to be used for hiding cocaine based, in part, on the containers' location and orientation on the ship, as well as their route and destination. This sophisticated operation required conspirators on the high seas and on multiple continents, and a relatively high degree of international coordination—sometimes through intermediaries, or through varying degrees of obfuscation between different arms of the conspiracy.

The evidence will also prove that the defendant was involved in coordinating the acquisition and transatlantic smuggling of several specific loads of cocaine that American law enforcement intercepted and seized in the United States, and which underlie the three substantive counts charged against the defendant.  Specifically, on February 27, 2019, federal agents seized approximately 1,437 kilograms of cocaine hidden aboard the MSC Carlotta at the Port of New York and New Jersey; on March 18, 2019, federal agents seized approximately 537 kilograms of cocaine hidden aboard the MSC Desiree at the Port of Philadelphia; and on June 19, 2019, in one of the largest cocaine seizures in American history, federal agents seized approximately 17,956 kilograms of cocaine hidden aboard the MSC Gayane at the Port of Philadelphia.

The government anticipates that multiple cooperating witnesses will testify at trial about the operation of this conspiracy, including their own roles in it, and about the defendant's role.  The defendant is a citizen of Montenegro who has extensive ties elsewhere in Europe and in Colombia.  The trial evidence will show that the defendant served as a critical link between cocaine suppliers and logistical coordinators in South America and cocaine buyers and investors in Europe, as well as with European sources of corrupt crewmembers on the high seas.

II.    The Sky Data

The government also anticipates that cooperating witnesses will testify about their use of "Sky phones" during the conspiracy.  More specifically, witnesses will testify that they

purchased (and paid a premium for) special encrypted phones for their criminal communications, and that they understood these phones to have been customized for operation on the Sky platform that was supposedly secure from law enforcement.  Because of the presumed security of the platform, they spoke openly about criminal conduct on these devices.  They will testify that they communicated with the defendant and coordinated narcotics trafficking with him using their Sky phones, and that the defendant's alias on the Sky network, at least at some point (since aliases could be changed), was "Serxio Ramos."[2]  At least one witness will also testify that in early 2021, Sky phones stopped working, and that it was understood among the conspirators that the outage had something to do with a law enforcement operation in Europe.

A federal law enforcement agent will also testify that the government, understanding that the French government had lawfully seized materials from the Sky network, made an MLAT request to France for data associated with two Sky user accounts, each denominated by a six-digit alphanumeric personal identification number ("PIN").[3]  The agent will testify that she received from French officials a set of files responsive to that request, along with a *procès-verbal*, or certification, signed by a French judicial officer to authenticate the materials.  Through that agent, the government expects to offer relevant excerpts taken from this Sky data (the "Sky Evidence") that the agent received directly from the French government.

The Sky Evidence, in the form in which France produced it to the government (and in which the government re-produced it in discovery to the defendant), is broadly like the kinds of communications data that the government routinely receives from domestic

---

[2]    Numerous members of the conspiracy used the names or nicknames of famous soccer players as their aliases on the Sky network—Sergio Ramos is one such name.

[3]    Each Sky user account is permanently associated with a PIN, whereas user aliases could be changed at will by the user.

telecommunication and social media companies in criminal investigations, and which federal courts routinely admit into evidence at trial. It is, to investigators and lawyers familiar with materials of this kind, largely self-explanatory and internally consistent. The data from each user account comprises a spreadsheet of account metadata and an account folder that is further divided into subfolders for individual "chats." The chat subfolders are designated by the user PIN(s) of the participant(s) in the respective chat, and each contains a spreadsheet of captured communications within the chat between the specified users—analogous to text message "conversations" on typical cell phones or social media platforms. Some chats also include transferred media files (*e.g.*, photos, audio recordings), and in such cases the chat subfolder includes a further "media" subfolder containing the media files, which are referenced by filename in the chat spreadsheet.

The metadata spreadsheet for each account contains, among other things, the account PIN, a list of aliases associated with that PIN over the lifetime of the account, dates and times of the first message and last message sent and received through the account, and the IMEI number[4] for the physical device associated with account. The account metadata for the older of the defendant's two Sky accounts lists a dozen user aliases that he used—including "Serxio Ramos," as anticipated trial testimony will establish the defendant was known to some co-conspirators, as well as the correct spelling "Sergio Ramos" and several other variants. Another of the user aliases is "Boxeador"—Spanish for boxer—which is notable because the defendant is a former professional boxer, and witnesses will testify that he often bragged about his boxing

---

[4] An IMEI number, or International Mobile Equipment Identity number, is a numeric identifier that is permanently associated with a particular cellular device, regardless of subsequent changes of user or service provider.

career.  The account metadata for the second of the defendant's two accounts also lists several user aliases, the first of which is "SERXIO RAMOS NEW =ROBERTOCARLOS."  This suggests that the second account is the new phone of "Serxio Ramos," now adopting the new alias of "Roberto Carlos."[5]

That suggestion is further confirmed by the contents of the chats themselves.   In one chat on the newer account, just days after that account's activation, the defendant identified himself to another person by sending a photograph of the screen of his *other* Sky phone, with the PIN visible, and wrote that he was taking a new phone because "Long time not change."  Some time later, he sent to himself—from his older Sky account to his newer one—a contact list (which includes numerous identified co-conspirators), evidently so that he would have his old contacts on his new Sky phone.  This communication is reflected in the Sky Evidence from both ends: that is, it appears in the Sky Evidence associated with the older account *from which* the contacts were sent, and again in the Sky Evidence associated with the newer account *to which* the contacts were sent, as it should be, in response to the government's request to France for the data of both accounts.  This expected duplication serves as further corroboration of the reliability of the data.

Although the defendant's use of the Sky accounts was nominally anonymous, he is identifiable in them through numerous means, in addition to the anticipated witness testimony that he is "Serxio Ramos."  For instance, the Sky communications include express references to travel at times and locations that match the defendant's known travel records, reference to being

---

[5]      Consistent with the pattern noted above that numerous members of this conspiracy adopted as aliases the names of famous soccer players, Roberto Carlos and Sergio Ramos are the names of two former players for the Spanish soccer club Real Madrid.

at a particular hotel and photos taken in the hotel gym on a date when that same hotel's records show that the defendant was a guest, an apparent reference to a birthday dinner on the defendant's birthdate, audio recordings in the defendant's voice, "selfies" taken in full-length mirrors in gym clothes with the defendant's face obscured but matching his distinctive build and physical characteristics, and photographs of the defendant's family.

The Sky Evidence also includes abundant explicit discussion of narcotics trafficking, including references to narcotics trafficking on the "Carlota" and "Gayane" (two of the three ships from which seizures are charged as substantive counts in the indictment) and refers to news reports about the seizures from those ships; photographs of packaged narcotics (some of which contain markings that match markings on drugs seized in this investigation); photographs of bulk cash, and of guns; photographs of the type of commercial cargo ships employed by the defendant and his co-conspirators, and parts of ships, including a ship's crane, as the conspiracy employed in service of their smuggling; and a photograph of what appears to be a computer screen displaying a ship-tracking application that shows the location of the MSC Desiree (another of the ships from which a seizure is charged in the indictment) off the coast of South America.

The Sky Evidence also includes a chat in which the defendant writes in (imperfect) Spanish, among other things, "Este es sapoo / Le podes matar si ???" ("This is the snitch / You can kill him, yes ???"), followed by a street address. That street address matches the home address in Colombia of an identified co-conspirator who was subsequently murdered in that home.

By emails dated October 18, 2024 and June 12, 2025, the defendant has noticed that he intends to call as expert witnesses Yehudi Moszkowicz, Andreas Milch, and Lee Koch,

seemingly all as experts on Sky evidence, European law, and/or the European law enforcement operation that led to the seizure of Sky evidence.

ARGUMENT

I.    <u>The Court Should Admit Evidence of the Defendant's Communications Over the Sky Network</u>

For evidence to be admitted at trial, the proponent must demonstrate that it is authentic and relevant. *See* FRE 401, 402, and 901. The Sky Evidence is both, and the Court should rule that it is admissible. Relevance requires little comment: as described above and as anticipated testimony will clearly establish at trial, the defendant and numerous other members of the conspiracy charged in this case coordinated and discussed their international drug trafficking over the Sky network, and evidence of those communications is thus manifestly relevant to (and highly probative of) the issues that will go before the jury. Authenticity, too, will be clearly established though witness testimony, a *procès-verbal* (or certification) signed by a French judicial officer, and the inherent qualities of the evidence.

Under Rule 901(a) of the FRE, a proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is"—in this case, communications by and among the defendant and other co-conspirators that were transmitted over the Sky network. "The bar for authentication of evidence is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007); *see also United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) (Rule 901 "does not erect a particularly high hurdle"). The proponent need not "rule out all possibilities inconsistent with authenticity, or [] prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted). Rather, "the standard for authentication is one of 'reasonable likelihood,' and is 'minimal.'" *Gagliardi*, 506 F.3d at 151. "Proof of authentication

8

may be direct or circumstantial." *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008)

"Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find

in favor of authenticity or identification." *Id.* at 173 (internal quotation marks omitted).

Moreover, the question of authenticity does not depend on the veracity of the

evidence, nor on the precise chain of custody or susceptibility to hypothetical tampering, because

such attributes go to weight rather than admissibility. *See, e.g.*, *United States v. Hamilton*, 334

F.3d 170, 186-87 (2d Cir. 2003) ("Once [proffered evidence] has been sufficiently authenticated,

any question as to the veracity of the [evidence] . . . goes to the evidence's weight rather than to

its admissibility."); *United States v. Reid*, 650 F. Supp. 3d 182, 196 (S.D.N.Y. 2023) ("Chain of

custody and arguments concerning the susceptibility of evidence to tampering go to the weight,

not admissibility, of evidence." (collecting cases)). "The ultimate determination as to whether

the evidence is, in fact, what its proponent claims is thereafter a matter for the jury." *United*

*States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014). In other words, authentication "merely

renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury." *United*

*States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001). "Thus, after the proponent of the evidence

has adduced sufficient evidence to support a finding that the proffered evidence is what it is

claimed to be, the opposing party 'remains free to challenge the reliability of the evidence, to

minimize its importance, or to argue alternative interpretations of its meaning, but these and

similar other challenges go to the weight of the evidence—not to its admissibility." *Vayner*, 769

F.3d at 131 (internal quotation marks omitted); *see also United States v. Harvey*, 117 F.3d 1044,

1049 (7th Cir. 1997) ("Only a prima facie showing of genuineness is required; the task of

deciding the evidence's true authenticity and probative value is left to the jury.").

That "not particularly high" bar is easily met here.  *Gagliardi*, 506 F.3d at 151.

Rule 901(b) provides a non-exhaustive list of ways that proponents can meet this low standard

for authentication, two of which are particularly relevant in this case.  First, under Rule

901(b)(1), authenticity can be established through testimony of a witness with knowledge that

"an item is what it is claimed to be."  Second, under Rule 901(b)(4), authenticity can be

established by a record's "distinctive characteristics," such as "[t]he appearance, contents,

substance, internal patterns, or other distinctive characteristics of the item, taken together with all

the circumstances" that demonstrate an item's authenticity.  These "circumstances" can include,

for instance, the circumstances surrounding the acquisition or discovery of the documents.  *See,*

*e.g.*, *Al-Moayad*, 545 F.3d at 173 (relying in part on testimony of where a document was seized

and received by the United States in deeming the document properly authenticated); *see also*

*United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) (holding that a document may be

authenticated by the circumstances surrounding its discovery); *United States v. Helmel*, 769 F.2d

1306 (8th Cir. 1985) (finding gambling ledger sufficiently authenticated even though author of

the ledger was unknown, because the contents of the ledger were such that only those persons

acquainted with the particular transactions and persons involved could have written them, the

ledger was found in one of the defendant's homes, and the names in the ledger corresponded to

members of the gambling enterprise).[6]

---

[6]     Additionally, Rule 902(3) provides that foreign public documents "signed or attested by a person who is authorized by a foreign country's law to do so" are "self-authenticating" and "require no extrinsic evidence of authenticity in order to be admitted."  The *procès-verbal* signed by a French judicial officer to certify the Sky evidence pursuant to the MLAT request is thus self-authenticating and admissible.  Even if the underlying Sky evidence is not itself a public document, it is drawn from a French law enforcement database, as judicially certified pursuant to treaty, and this certificate thus lends further support to its authenticity.  *See generally* Mutual Legal Assistance Treaty Between the U.S.A. and France, Articles 9 & 10, https://www.state.gov/wp-content/uploads/2019/02/13010-France-Law-Enforcement-MLAT-

As described above, multiple witnesses will testify from firsthand knowledge that the defendant and other conspirators (including the witnesses themselves) communicated with each other about drug trafficking over the Sky network, and they will identify one of the defendant's usernames on that network. Additionally, a law enforcement witness will testify, also from firsthand knowledge, that the government requested the contents of the defendant's Sky accounts from a foreign government, and that she personally received the Sky evidence and the *procès-verbal* certifying it from the foreign government. This testimony alone, with no further analysis, is sufficient to meet the proponent's "minimal" burden of establishing a "reasonable likelihood" that the Sky evidence is what the government says it is, for purposes of authentication. *Gagliardi*, 506 F.3d at 151. Any argument that the Sky evidence is otherwise goes to weight and should be directed to the jury.

Moreover, even if that testimony were not sufficient, the inherent qualities and distinctive characteristics of the Sky evidence itself, including its "appearance, contents, substance, internal patterns," and especially when "taken together with all the circumstances" of its acquisition directly from a foreign government, FRE 901(b)(4), weigh heavily in favor of a finding that it is what the government says it is. As noted above, and as is clear in the excerpts attached as Exhibit 1[7], the Sky evidence is replete with express references to and evidence of drug trafficking, including references to drug trafficking on the "Carlota" and "Gayane" (two of

---

12.10.1998.pdf (requiring the "Requested State" to provide to the "Requesting State" a *procès-verbal* or certificate certifying records and seized evidence, which "shall be admissible in evidence in the Requesting State").

[7]     For the convenience of the Court in the resolution of motions *in limine*, illustrative excerpts from the evidence are attached as exemplars (with draft translations of foreign language material inserted). The exhibits to this motion are not final trial exhibits and the government can make further excerpts or the underlying materials (which were produced to the defendant in discovery) available for the Court's inspection upon request.

the three ships on which cocaine trafficking is charged as substantive MDLEA counts). It includes references to news reports about the seizures from those ships, photographs of packaged narcotics (some of which contain markings that match markings on drugs seized in this investigation), photographs of bulk cash and guns and ships and parts of ships, and a photograph of a computer screen displaying a ship-tracking application that shows the location of the MSC Desiree (the other ship on which cocaine trafficking is substantively charged) off the coast of South America. In sum, even a relatively cursory examination establishes far more than a "reasonable likelihood" that the Sky Evidence includes communications about the conduct charged in this case by conspirators who were involved in it, among them the defendant.

That is more than what is necessary to establish its admissibility, but the authenticity and relevance of the Sky Evidence is still further established by identification evidence that ties it to the defendant. Specifically, the Sky Evidence includes communications with express references to travel at times and locations that match the defendant's travel records (as in Exhibit 2, attached), reference to being at a particular hotel and photos taken in the hotel gym on a date when that same hotel's records show that the defendant was a guest (*see id.*), and an apparent reference to a birthday dinner on the defendant's birthdate (as in Exhibit 3, attached). The Sky evidence also includes audio recordings in the defendant's voice (matching his voice on recorded jail calls and recordings obtained from the phone seized from him at his arrest), and images that closely match images obtained from the phone seized from the defendant at his arrest, including "selfies" taken in full-length mirrors with the defendant's face obscured but matching his distinctive build and physical characteristics.

In sum, (1) testimony from co-conspirators that they communicated with the defendant about drug trafficking over the Sky network, (2) testimony from an agent that she

received the Sky evidence upon request directly from a foreign government, certified by an official of that government, and (3) the distinctive characteristics of the Sky evidence itself, including evidence that plainly establishes its relevance to the charged conduct and its connection to the defendant, all combine to vastly exceed the low bar for establishing authenticity and admissibility at trial. This conclusion is consistent with the only ruling on the authentication and admissibility of Sky evidence from an American court that the government is aware of to date. *See United States v. Didani*, No. 21-20264, 2025 WL 452472, at *3 (E.D. Mich. Feb. 10, 2025) ("Based on the Government's proffer, it appears it can meet its slight burden to show that the Sky ECC records are authentic and what the Government claims the text messages are—text messages sent or received by [the defendant]."). Any challenge the defendant wishes to make to the reliability of the Sky Evidence falls squarely within the province of the jury to decide.

II.    The Court Should Admit Evidence of Uncharged Drug Trafficking as Direct Evidence, Inextricably Intertwined with the Charged Conspiracy and/or as Admissible "Other Crimes, Wrongs or Acts" Under Rule 404(b)

The government anticipates that some of the testimony of cooperating witnesses and communications in the Sky Evidence will pertain to drug trafficking other than that charged as substantive MDLEA counts. Because the defendant was involved in international drug trafficking of enormous scope—spanning years and half of the globe—such evidence is inextricable from the evidence of charged conduct and also establishes the defendant's knowledge and methods and his relationships with co-conspirators. The Court should therefore admit such evidence as direct evidence of the charged conspiracy, and in the alternative under Rule 404(b).

13

Evidence of uncharged acts, even uncharged acts that amount to criminal activity, is admissible as direct evidence of crimes charged in the indictment. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994); *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989). In *Towne*, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of a charged offense:

> Evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'

*Towne*, 870 F.2d at 886 (quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983)); *see also Carboni*, 204 F.3d at 44; *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *United States v. Khan*, 591 F. Supp.2d 202, 205 (E.D.N.Y. 2008) (quoting *Carboni*).

The Second Circuit has stated more broadly that evidence does not fall within the category of prohibited "other-act evidence within the meaning of Rule 404(b)" when it is relevant "to prove material facts other than [the defendant's] propensity to commit a crime[.]" *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). Indeed, relevant evidence is "not confined to that which directly establishes an element of the crime." *Gonzalez*, 110 F.3d at 941. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

Additionally, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when it is offered for any purpose other than the defendant's criminal propensity. *See United States v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998); *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984). Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FRE 404(b); *see also Levy*, 731 F.2d at 1002. The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application. *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible."). Indeed, the Second Circuit has long interpreted Rule 404(b) as an inclusive rule allowing the admission of relevant "other acts" evidence if the evidence is offered to prove something other than criminal propensity and if it passes the balancing test required by Rule 403. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *United States v. Stevens*, 83 F.3d 60, 68 (2d Cir. 1996) ("[T]his Circuit takes an inclusive approach to prior bad act testimony: such testimony can be admitted for any purpose except to show criminal propensity"); *Germosen*, 139 F.3d at 127 ("[I]t can be admitted for any purpose except to show criminal propensity, unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice." (internal quotation marks and citation omitted)).

In this case, evidence of the defendant's prior and subsequent drug trafficking with co-conspirators leading up to and following the charged period, and his contemporaneous drug trafficking during the charged conspiracy period but extending beyond the three charged substantive counts is "inextricably intertwined with the evidence" of the charged offenses,

15

*Towne*, 870 F.2d at 886, and also "adds context and dimension to the government's proof of the charges," *Gonzalez*, 110 F.3d at 941.  Indeed, the defendant's communications with various co-conspirators whether specifically pertaining to the three charged substantive offenses or otherwise is necessary for the jury to understand and appreciate the criminal relationship between the defendant and his co-conspirators and the broader charged conspiracy.

Similarly, although the defendant is not charged with soliciting a murder, his message written in (imperfect) Spanish identifying someone as a "snitch" and asking if he can be murdered ("Este es sapoo / Le podes matar si ???" ["This is the snitch / You can kill him, yes ???"]) is consistent with, and highly probative of, his being involved in narcotics trafficking at the high level and massive scale that he *is* charged with.[8]  Contemplating that kind of retaliatory violence is not necessarily inherent to all drug trafficking, but it *is* inherent to trafficking cocaine by the metric ton.  The fact that the defendant would send such a message, and would have contacts with people to whom one *can* send such a message, is thus highly probative of his involvement in the charged conspiracy.

Additionally, even if this evidence were not admissible as directly relevant to the charged crimes (which it is), it should be admissible for the purposes allowed under FRE 404(b).  Specifically in the context of narcotics cases, evidence of prior narcotics transactions is regularly admitted to prove the defendant's knowledge and intent during the charged offenses.  *See United States v. Paulino*, 445 F.3d 211, 221–22 (2d Cir. 2006).  Past distribution of controlled substances is probative of whether the defendant had the knowledge, motive, and intent to import and distribute a controlled substance on the particular occasion charged.  *See, e.g.*, *United States*

---

[8]     To be clear, the government does not intend to offer evidence or elicit testimony about the identity of the co-conspirator who lived at the Colombian address that the defendant provided in that message, or the fact that he was subsequently murdered at that address.

*v. Thompson*, 690 F. App'x 302, 308 (6th Cir. 2017) (finding no error in admitting evidence of defendant's past marijuana distribution under Rule 404(b) where defendant was charged with possessing with intent to distribute heroin, cocaine base, and marijuana); *see also United States v. Thorne*, No. CR 18-389 (BAH), 2020 WL 122985, at *19 (D.D.C. Jan. 10, 2020) ("The difference in the type of illegal narcotics at issue does not render the prior conviction irrelevant for [the purposes of showing a defendant's knowledge, motive and intent].").

Moreover, because the communications described above were relatively close in time to the charged offense, they are especially probative of the defendant's mental state at that time, which will be a key issue at trial. *See, e.g.*, *United States v. Baker*, No. 09-CR-20055, 2009 WL 3672061, at *5 (C.D. Ill. Oct. 28, 2009) (noting that evidence of past drug activity was admissible in part because the past activity occurred over three months before the charged misconduct and was therefore "extremely close in time to the charged offense"). The government anticipates that the evidence at trial will establish indisputably that a massive and complex international narcotics trafficking conspiracy existed, and the defendant was associated and worked with numerous co-conspirators, and thus the central issue will be his knowledge and role. His other acts of drug trafficking, including precisely contemporaneous ones and those underlying his criminal relationships with co-conspirators, are highly probative on those issues. In short, the admissibility requirements of Rule 404(b) will be readily satisfied by the government's proof at trial.

III.    The Court Should Admit Statements of the Defendant and His Co-Conspirators, When Offered by the Government

The government anticipates that trial testimony from cooperating witnesses will include out-of-court statements of the defendant and other co-conspirators, and portions of the Sky Evidence will also constitute such statements. These statements are relevant and probative

17

of the charged conduct and will corroborate the testimony of cooperating witnesses, and they are admissible (when offered by the government, but not by the defendant) as non-hearsay statements of party opponents and as statements of co-conspirators in furtherance of a conspiracy.

A.    Defendant Statements Are Admissible When Offered by the Government

Pursuant to Rule 801(d)(2)(A) of the FRE, a defendant's out-of-court statement is not hearsay when offered by the government.  ("A statement is not hearsay if . . . [it] is offered against a party and is [] the party's own statement."); *see also*, *e.g.*, *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (under Rule 801(d)(2)(A), a defendant's statements offered by the government are not hearsay because they are statements of the opposing party).

A defendant, however, does not have a parallel ability to offer his or her own statements into evidence.  "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  *Marin, 669 F.2d at 84*; *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (the defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted"); *United States v. Black*, No. 13-CR-316 (DLI), 2014 WL 5783067, at *2 (E.D.N.Y. Nov. 5, 2014) ("[T]he defendant's self-serving [sic], exculpatory statements are inadmissible hearsay . . . ."); *United States v. Mahaffy*, No. 05-CR-613 (S-3) (ILG), 2007 WL 1094153, at *3-5 (E.D.N.Y. Apr. 10, 2007) (refusing to permit introduction of excerpts of defendant's prior statements because they were "otherwise inadmissible hearsay statements" that were "self-serving" and "exculpatory").

Furthermore, the government's presentation of only a portion of the defendant's prior statements does not make the defendant's other statements admissible.  Rule 106 provides,

18

in relevant part, that when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. The Second Circuit has found this rule applicable to oral statements as well. *See United States v. Johnson*, 507 F.3d 793, 796 n.2 (2d Cir. 2007). However, "Rule 106 does not render admissible evidence that is otherwise inadmissible." *United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983); *see also United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (quoting *United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2016)) (Importantly, "the rule of completeness is 'not a mechanism to bypass hearsay rules for any self-serving testimony'"). Accordingly, the rule "does not . . . require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014) (citations omitted); *United States v. Harper*, No. 05-CR-6068, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009) ("[A] defendant may not rely on the rule of completeness to put his out-of-court exculpatory statements before the jury through the testimony of another witness . . . , while at the same time maintaining his own Fifth Amendment privilege so as to avoid being cross-examined about his prior statements.").

Rather, the statement specified by the adverse party is only required to be read or heard if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact or (4) insure a fair and impartial understanding of the admitted portion. *Marin*, 669 F.2d at 82–83; *see also United States v. Fawwaz*, 691 F. App'x 676, 678 (2d Cir. June 2, 2017) (summary order) (One exception to this principle is the rule of completeness, wherein "an omitted portion of the statement" may be admitted where "necessary

to explain the omitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.").

As the Second Circuit made clear in *United States v. Jackson*, a defendant may not introduce other parts of the same statement offered in part by the government unless the defendant makes a proper showing that the statements he seeks to introduce have a separate basis for admission.  180 F.3d 55, 73 (2d Cir. 1999) (rejecting claim under the completeness doctrine that part of a statement made by the defendant could be admitted because the statement followed an inculpatory admission and noting that "the portions of the tape proffered by [the defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay"); *see also United States v. Hill*, 658 F. App'x 600, 605 (2d Cir. 2016) (affirming district court's parsing of a defendant's recorded statement to admit the discrete inculpatory statements and exclude the other self-serving statements that he was "innocent"); *United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) (holding that the court properly bifurcated a defendant's post-arrest statement and precluded the defense from introducing a self-serving portion of the defendant's post-arrest statement).  The burden rests with the defendant to demonstrate that the portions of the statement he seeks to offer are necessary to clarify or explain the portions the government intends to offer.  *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

B.    <u>Co-Conspirator Statements Are Admissible When Offered by the Government</u>

Pursuant to Rule 801(d)(2)(E) of the FRE, a statement offered against an opposing party and "made by the party's coconspirator during and in further of the conspiracy" is not hearsay.  "The law is well settled within this circuit that declarations that are otherwise

20

hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances." *United States v. Cambindo Valencia*, 609 F.2d 603, 630 (2d Cir. 1979). "To admit a statement under the co-conspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." *Id.* Moreover, out-of-court statements by co-conspirators that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible. *Id.* However, the "Government need not show that the listener, or the person who heard the declarant's statement, was also a member of the conspiracy." *United States v. Paredes*, 176 F. Supp. 2d 183, 187 (S.D.N.Y. 2001). Indeed, a communication "with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the plan's goals" is admissible. *Id.*

The admission of co-conspirator statements in furtherance of a conspiracy is appropriate irrespective of whether the co-conspirator testifies, because "[i]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial." *United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2005). "It is well established that the Confrontation Clause bars admission of *testimonial* statements" of non-testifying witnesses. *United States v. Failing*, 553

F. App'x 71, 72 (2d Cir. 2014) (quoting *Davis v. Washington*, 547 U.S. 813, 821 (2006)) (internal quotation marks omitted and emphasis added). Courts "determine whether a statement is or is not 'testimonial' by examining the declarant's awareness or expectation that his or her statements may later be used at a trial." *Id.* (quoting *United States v. Farhane*, 634 F.3d 127, 163 (2d Cir. 2011)) (internal quotation marks omitted). Here, where all co-conspirator statements were made prior to arrest and among co-conspirators, or on a recording surreptitiously made by an individual that defendants did not know was acting on behalf of the government, "there is no question that [defendants were] unaware that [they were] speaking to [an] agent[] for the government or that [their] statements might later be used at a trial." *Farhane*, 634 F.3d at 163. All of the co-conspirator statements are therefore non-testimonial and not subject to challenge under the Confrontation Clause. *Id.*

IV.    In the Event the Parties Do Not Enter Stipulations, the Court Should Allow the Government to Authenticate Certain Documents and Records by Certification

In the interest of streamlining trial and avoiding unnecessary witnesses, the government will attempt in good faith to reach agreement with the defendant about stipulations as to the authenticity and admissibility of certain electronic evidence. In the event that those efforts fail and the parties do not enter stipulations, the government will seek to authenticate electronic evidence—specifically, excerpts from the contents of cell phones seized from the defendant—by means of certifications under Rules 902(11), (13), and (14).

Rules 902(13) and (14) of the FRE provide a mechanism for parties to authenticate evidence generated by electronic processes or systems. The rules combine the conceptual frameworks of Rule 901(b)(9)—authentication of evidence describing a process or system that produces an accurate result—and Rules 902(11) and (12)—self-authentication of business records. Specifically, Rule 902(13) allows authentication by certification of "[a] record

generated by an electronic process or system that produces an accurate result," and Rule 902(14) does the same for "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification."

The electronic contents of cellphones and other electronic devices are records generated by an electronic process or system that produces an accurate result, as are forensic extractions or other electronic copies of data extracted from such devices. Such extractions, and excerpts from them, can therefore be authenticated by certification pursuant to Rules 902(11) and (13), and reliable copies by Rule 902(14).[9] *See, e.g.*, *United States v. Dunnican*, 961 F.3d 859, 872 (6th Cir. 2020) (affirming district court's decision to admit text message evidence extracted from defendant's phone as self-authenticating under FRE 902(14)); *United States v. Kamaldoss*, 19-CR-543(ARR), ECF No. 237 at 3 (finding WhatsApp communications extracted from cellphone properly self-authenticating by certificate pursuant to Rule 902(13) and 902(14); *United States v. Anderson*, 563 F. Supp. 3d 691, 695–96 (E.D. Mich. 2021) (finding text messages self-authenticating under FRE 902(14)).

Excerpts from such records that are generated using standard electronic systems and processes to generate copies for use in discovery and as trial exhibits are examples of data copied from an electronic device, storage medium, or file which may be authenticated by a process of digital identification. Accordingly, these items of electronic evidence can be authenticated, pursuant to Rules 902(13) and (14), by certification of competent technicians who performed the extractions and generated the copies rather than by the live testimony of those

---

[9]    Self-authentication of electronic evidence by certification establishes that electronic evidence is authentic, not that it is relevant or non-hearsay. In this case, the self-authenticating electronic contents extracted from the cellphones will be non-hearsay evidence that is relevant because it connects the defendant to, and therefore serves as attribution evidence for, the Sky Evidence (for instance, by visual similarity to photographs in the Sky Evidence).

technicians. *Id.* (finding digital records sufficiently authenticated under FREs 902(11) and 902(13) where the certificates were not testimonial in nature).

In the context of business records, which provided the conceptual framework for self-authentication of electronic evidence under Rules 902(13) and (14), the Supreme Court has held that admitting evidence that has been authenticated by affidavit or certificate does not violate a defendant's right to confrontation because certifications are not testimonial. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Relying on *Melendez-Diaz*, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible. *See, e.g.*, *United States v. Qualls*, 613 F. App'x 25, 28 (2d Cir. 2015); *United States v. Johnson*, 688 F.3d 494, 504-05 (8th Cir. 2012); *United States v. Yeley-Davis*, 632 F.3d 673, 680-81 (10th Cir. 2011); *United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007); *United States v. Ellis*, 460 F.3d 920 (7th Cir. 2006); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005). The facts concerning the electronic systems that generate electronic records and the processes of making electronic copies, like the processes of maintaining business records, are not testimonial because they only establish authenticity—that the records were generated by a reliable process and are what they purport to be—and can therefore be established by certification without implicating the Confrontation Clause. It is the underlying records, not the certification of a custodian or technician who maintained or electronically copied them, that are introduced to establish the facts at trial. Consistent with this understanding of the confrontation right, federal law permits the authentication by certification of business records, electronic records generated by reliable electronic processes, and reliable electronic copies.

24

The government will work with defense counsel toward stipulations concerning electronic evidence, which, if reached, will obviate the need for a ruling on authentication by certification.  Should those efforts fail, the government should be permitted to authenticate and offer as evidence copies and extracts from electronic evidence, including images and other electronic files extracted from cellphones, by certification, as permitted by Rules 902(11), (13), and (14).

V.    The Court Should Preclude All Testimony and Argument Relitigating Suppression Issues or Otherwise Suggesting that Any Evidence Was Obtained Unlawfully

The defendant should be precluded from arguing, commenting on or eliciting testimony about the legality of the European law enforcement operation that led to the seizure of the Sky Evidence, or otherwise arguing or insinuating that evidence was improperly obtained, or that there was something sinister about the government's conduct in the investigation of the defendant.

In two reasoned opinions, the latter following an evidentiary hearing, U.S. District Judge Alleyne R. Ross denied the defendant's suppression motion in its entirety.  (*See* ECF Nos. 79, 91).  For the reasons stated in each respective Opinion and Order, all the challenged evidence, including the Sky Evidence, was obtained lawfully and will not be suppressed. Accordingly, any attempt by the defendant to raise claims that European or United States law enforcement obtained evidence in violation of the defendant's rights or by means of conduct that should shock the conscience would be in direct contravention of the Court's prior rulings in this case, and would merely serve to draw attention to matters that have no bearing on the defendant's guilt.  *Cf., e.g.*, *United States v. Lights*, No. 15 CR 721, 2016 WL 7098633, at *1-2 (S.D.N.Y. Dec. 5, 2016) ("The stop and subsequent searches were all based on valid probable

cause.  This issue has been litigated and decided.  No reference to the illegality of the stop or subsequent searches will be permitted at trial.").[10]

Neither European nor United States law enforcement is on trial, and the propriety of the law enforcement operations that led to the government's possession of admissible evidence in this case neither tends to prove nor disprove any element of any charged offense, nor any other fact "of consequence" at trial.  FRE 401.  Any such arguments would thus be irrelevant under Rule 401, having no bearing on any question at issue, and any arguable probative value would be substantially outweighed by the risks enumerated in Rule 403, including unfair prejudice, confusion of the issues, and misleading the jury, as well as undue delay and waste of time.

VI.    The Court Should Preclude the Defendant's Proposed Expert Testimony to the Extent its Purpose Is to Relitigate Suppression Issues or Otherwise Suggest that Any Evidence Was Obtained Unlawfully

The proposed testimony offered by the defendant's three purported expert witnesses should be largely if not entirely precluded because (i) it is largely irrelevant, unreliable, and unhelpful to any question to be decided by the jury, and thus inadmissible under FRE 402 and 702; (ii) under FRE 403, any marginal value of this opinion testimony is

---

[10]      Rule 104 makes clear that the Court decides "preliminary questions" outside the presence of the jury, including whether evidence is admissible.  To permit the defense to argue or insinuate that the relevant evidence was obtained unlawfully, or that the investigation of the defendant was somehow founded upon an impermissible premise, would flout Rule 104 and would invite a needless and irrelevant mini-trial on the scope of the Fourth Amendment and whether law enforcement properly obtained the evidence in this case.  *See generally United States v. Stewart*, 433 F.3d 273, 313 (2d Cir. 2006).  Any attempts to shift the jury's attention away from the question of whether the evidence is sufficient to prove the defendant's guilt is a distraction from the trial and may be an attempt to appeal to a jury's feelings regarding law enforcement investigations, rather than their determination about the defendant's guilt in this case.

substantially outweighed by the high likelihood of unfair prejudice to the government, confusion

of the issues, misleading the jury, undue delay and wasting the time of the Court, jury and

government, should the testimony be permitted; and (iii) the defendant appears to be attempting

to use these witnesses to relitigate the suppression motion that was previously decided and which

the defendant lost.

A.    _Daubert_

In *Daubert* and its progeny, the Supreme Court focused on a district court's

gatekeeping obligation when considering the admissibility of expert testimony based on

specialized knowledge under Rule 702.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579, 595 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Although the Second Circuit applies a liberal approach with respect to the admission of expert

evidence, *see, e.g.*, *United States v. Jakobetz*, 955 F.2d 786, 794 (2d Cir. 1992), the Supreme

Court has explained that a district court, in executing its gatekeeping function, must ensure "that

an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert*, 509 U.S. at 597.  The proponent of the expert's testimony bears the burden of

establishing its admissibility by a preponderance of the evidence.  *Id.* at 592 n.10.

As the Second Circuit has stated, "[t]he district court cannot perform [the]

complex evaluation of an expert's proposed methodology without a clear articulation of what the

expert's opinions are and, even more importantly, of the bases for those opinions."  *United States*

*v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017).  Thus, for a court to evaluate an expert's

methodology, the proponent of the expert's testimony must comply with Rule 16(b)(1)(C)(iii) of

the Federal Rules of Criminal Procedure, which requires the defendant to disclose, for each

expert witness, (1) "a complete statement of all opinions that the defendant will elicit from the

witness in the defendant's case-in-chief"; (2) "the bases and reasons for them"; (3) "the witness's qualifications, including a list of all publications authored in the previous 10 years"; and (4) "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition."  Such disclosures must be made "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence."  Fed. R. Crim. P. 16(b)(1)(C)(ii).  The purpose of the rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Wilson,* 493 F. Supp. 2d 484, 486-87 (E.D.N.Y. 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment); *see also United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 413318, *5 (S.D.N.Y. Feb. 1, 2015), *aff'd* 858 F.3d 71 (2d Cir. 2017).

   B.    Admissibility Under Rules 702, 402, and 403

        With respect to the admission of expert testimony, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

        The Supreme Court has explained that Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 590.  Expert opinions are inadmissible if based on speculative assumptions.  *See id.* at 589-590 ("knowledge" within the meaning of Rule 702 means more than subjective belief and unsupported speculation); *see also Kumho Tire*, 526 U.S. at 157 (1999) ("[o]pinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be admitted).

28

In addition, under Rule 402, "[i]rrelevant evidence is not admissible." Thus, a district court may preclude a proposed expert's testimony if the testimony is not relevant to the issues at trial. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 311-12 & n.10 (2d Cir. 2006) (affirming preclusion of expert testimony; "expert testimony regarding an issue not relevant to the charges under consideration has the potential to confuse the jury"); *United States v. Brooks*, No. 08-CR-35 (PKL), 2008 WL 2332371, at *2 (S.D.N.Y. June 4, 2008) (precluding expert testimony as "irrelevant to this trial," noting "substantial risk that such testimony would confuse the jury").

Even if the proposed testimony has some relevance, a district court may preclude testimony if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* FRE 403; *see also United States v. Dupre*, 462 F.3d 131, 138 (2d Cir. 2006) (district court properly precluded expert testimony under Rule 403).

C.     The Court Should Preclude the Proffered Testimony As Unreliable and Offered by Unqualified Witnesses, Irrelevant, and Unfairly Prejudicial

The proffered testimony is inadmissible. The putative experts are, in fact, attorneys who may have litigated or analyzed cases that relate to the use of Sky data in various courts across Europe. Expert opinion testimony from such witnesses is impermissible for several reasons.

*First*, and as a threshold matter, any testimony about European courts, European law, or any prior European litigation has no relevance to the case brought against the defendant, as European legal standards and evidentiary rules have no application in this Court, *see, e.g.*, *United States v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007) ("The admissibility of evidence in a

United States court depends solely on compliance with United States law."), and because such testimony clearly does not tend to prove or disprove any element of any charged offense, or any other fact "of consequence" at trial.  FRE 401.

        *Second*, the proffered witnesses do not actually have expert knowledge of the Sky data.  They were neither privy to the European law enforcement operation that resulted in capturing the Sky data, nor executives or other employees of Sky ECC while it was operable such that they could have a reliable and trustworthy basis for their testimony.  Indeed, they do not have, and have never had, knowledge of how the Sky data was collected nor access to the data more broadly than what has been produced as discovery in the cases they have litigated or for which they have consulted.  That hardly qualifies them to offer an expert opinion concerning the Sky Evidence in this case.  The presentation of data in cases they have litigated in Europe may have differed for a variety of reasons not least among them the application of different rules of law and evidence that govern European courts.  Regardless, the defendant will have ample opportunity to cross examine the government's witnesses concerning the Sky Evidence's reliability and weight, and any purported anomalies in the presentation of data, and may argue to the jury that it should give little or even no weight to the Sky Evidence based on any apparent deficiencies or inconsistencies in the data (*e.g.*, some chats are incomplete, and were evidently only captured or decrypted from one side of a conversation).  The government does not seek to preclude the defendant from bringing such challenges to the evidence's weight, which can be properly argued to the jury based on the attributes of the evidence itself—but the Court should not permit a detour into speculative claims about European law enforcement or irrelevant testimony about European law.

*Third*, in addition to being irrelevant to the pending charges, the proffered testimony would run a significant risk of utterly confusing the issues, misleading the jury, causing undue delay, and wasting the jury and Court's time and resources. Moreover, the defendant's attempt to introduce this type of testimony betrays his true intent—*i.e.*, to relitigate the propriety of the European law enforcement operation and the government's receipt of evidence in this case from France. Not only has the Court has already ruled on those issues and denied the defendant's motions, as noted above, but such issues have no relevance to the matters before the jury.

VII.    The Court Should Preclude Evidence and Argument Concerning Possible Punishment and Collateral Consequences

The classification of charges and the penalties arising from conviction in this case are not relevant to the issue of defendant's guilt or innocence. Accordingly, they should not be alluded to, presented, or disclosed to the jury. "It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991). Indeed, "it is the practice in the federal courts to instruct juries that they are not to be concerned with the consequences to the defendant of the verdict, except where required by statute." *Id.*; *see also Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished "that the jury had no sentencing function and should reach its verdict without regard to what sentence might be imposed").

In general, "[i]nformation regarding the consequences of a verdict is . . . irrelevant to the jury's task." *Shannon v. United States*, 512 U.S. 573, 579 (1994). Such evidence is not only irrelevant, but "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a

31

defendant's guilt. *See generally* Sand, et al., Modern Federal Jury Instructions, Instruction 9.01 (2021 ed.); *see also Shannon*, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); *United States v. Watts*, 934 F. Supp. 2d 451, 464–65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion . . . would result.").

Thus, Courts regularly preclude evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury. *See, e.g.*, *United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"). Allusion to or argument about consequences of conviction is an improper appeal to personal sympathy and an invitation to jury nullification; but guilt should determine punishment, not the other way around. *See United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent."). Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." *Id.* at 616. Although the defendant has not stated any intention to reference the possible consequences of conviction at trial, the government moves to preclude any mention of such consequences out of an abundance of caution. Any reference to sentencing will serve to confuse the jury, undermine its role as the trier of fact, and invite the jury to consider nullification, which is a violation of the Court's instructions and an outcome the Court is

dutybound to prevent. *Id.* Therefore, the Court should preclude references to potential punishment or collateral consequences at trial.

CONCLUSION

For the reasons set forth above, the government respectfully submits that its motion should be granted.

Dated:    Brooklyn, New York
          June 13, 2025

                              Respectfully submitted,

                              JOSEPH NOCELLA, JR.
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

                    By:    /s/_____
                           Robert M. Pollack
                           Nomi D. Berenson
                           Assistant United States Attorneys
                           (718) 254-7000