FJN:NDB/KPO
F. #2022R00883/NY-NYE-865

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

Docket No. 22-CR-493 (JMA)

GORAN GOGIC,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nomi D. Berenson
Katherine P. Onyshko
Francisco J. Navarro
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

Preliminary Statement ........ 1
Background ........ 2
Argument ........ 8
I. Legal Standard ........ 8
II. The Jury's Impartiality Requires Additional Protection ........ 13
A. The Defendant is Dangerous ........ 13
B. The Defendant Has Interfered with the Judicial Process ........ 14
C. Media Coverage Will Expose Jurors to Extraordinary Pressure ........ 15
D. An Anonymous Jury Will Not Prejudice the Defendant ........ 16
CONCLUSION ........ 17

PRELIMINARY STATEMENT

In advance of trial, the government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in this case. For the reasons set forth below, the government respectfully requests that (1) the identities of all prospective jurors, including their names, addresses and places of employment, not be revealed to either party or their attorneys; and (2) the jurors be transported to and from the courthouse by the U.S. Marshals Service ("USMS") each trial day and be sequestered from the public while in the courthouse during each trial day. These limited measures are necessary to assure the public's right to a fair trial by protecting the jury from improper influence or intimidation. These measures are also meant to mitigate any fear in the minds of the jurors of any such harassment, intimidation, or other interference. Moreover, these precautions will not deprive the defendant of meaningful jury selection, diminish the presumption of innocence, or cause any prejudice.

Moreover, because the Court can take reasonable precautions to minimize the risk of prejudice from an anonymous and partially sequestered jury, including instructing the jury that anonymity and partial sequestration are routine and designed to protect jurors' privacy, there is no risk that the defendant's fundamental rights will be infringed. Finally, this case presents many of the same strong and credible reasons to believe that the jury needs protection that judges in this District have found compelling in other trials including: (a) the trial of Sinaloa Cartel leader Joaquin Guzman Loera ("El Chapo"), *see United States v. Guzman Loera*, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018) (Doc. No. 187) ("to protect the integrity of the trial and to mitigate any fear of harassment or intimidation in the jurors' minds"), (b) the trial of top Mexican law enforcement official Genao Garcia Luna, *see United States v. Garcia Luna*, No. 19-CR-576 (BMC) (E.D.N.Y. July 5, 2022) (Doc. No. 103) ("[the] pervasive violence and the broad reach of the cartel

makes it reasonably likely that jurors may become fearful for their individual safety if not provided with anonymity" and because the defendant "likely has the intent and resources to engage in witness intimidation and harassment"), (c) the trial of Robert Sylvester Kelly ("R. Kelly"), *see United States v. Kelly*, No. 19-CR-286 (AMD), 2020 WL 8482693, at *1 (E.D.N.Y. Oct. 8, 2020) (serious pending charges, alleged witness intimidation and other obstructive efforts both by the defendant and others including the defendant's associates), and (d) the trial of Karl Jordan, Jr. and Ronald Washington for the murder of Run-D.M.C. deejay Jason Mizell, *see United States v. Jordan*, No. 20-CR-305 (LDH) (E.D.N.Y. Jan. 13, 2023) (defendants' dangerousness, history with attempted witness tampering and ability to potentially tamper with witnesses while incarcerated). Accordingly, and for the reasons set forth below, the government respectfully requests that the Court grant its motion for an anonymous and partially sequestered jury.

The government has conferred with defense counsel who opposes this request.[1]

## BACKGROUND[2]

### I. The Charged Crimes

This case arises from the government's years' long investigation of a major international narcotics trafficking conspiracy that involved smuggling huge quantities of cocaine from South America to the United States and Europe in commercial container ships—routinely moving hundreds and sometimes even thousands of kilograms of cocaine worth tens of millions of dollars at a time. The breadth of this operation necessarily spanned and involved powerful

[1] Counsel seeks two weeks to respond to the instant motion; the government has no objection to that request.

[2] For the convenience of the Court, the government summarizes only the pertinent factual and procedural history of the case.

narcotics traffickers in Colombia and other South American cocaine-producing countries and other powerful narcotics traffickers in the Balkans, Netherlands, Belgium, and elsewhere in Europe.

The defendant is a citizen of Montenegro with extensive ties elsewhere in Europe and in Colombia. He has trafficked massive quantities of narcotics for the Balkan cartels. At trial, the government's evidence will prove that the defendant was involved in coordinating the acquisition and transatlantic smuggling of several specific shipments of cocaine that American and foreign law enforcement intercepted and seized in the United States, Panama, Peru, and elsewhere.

The government anticipates that multiple cooperating witnesses will testify at trial about the operation of this conspiracy, including their own roles in it, and about the defendant's role. The trial evidence will show that the defendant served as a critical link between cocaine suppliers and logistical coordinators in South America and cocaine buyers and investors in Europe (particularly in the Balkans), as well as with individuals who had access to corrupt crewmembers aboard the maritime vessels the conspiracy used to transport its cocaine.

II. Interference with the Judicial Process

Trial in *Gogic* was previously scheduled to begin on November 17, 2025. On November 3 and 5, 2025, the Honorable Clay H. Kaminsky, United States Magistrate Judge for the Eastern District of New York, presided over jury selection. One juror ("Juror-1") was among those selected to serve as a trial juror. As set forth in an indictment and court filings in *United States v. Krasniqi et al.*, 25-CR-385 (JMA), after Judge Kaminsky selected the jury, a conspiracy to approach and bribe Juror-1 with a cash payment in exchange for Juror-1 agreeing to vote not guilty at the *Gogic* trial unfolded. To date, three individuals have been convicted of obstruction of justice in connection with this jury tampering scheme. Those defendants have strong ties to

both Italian and Albanian organized crime (*see e.g.*, Doc. No. 32 at 9), which appear to intersect in the instant case.

Even aside from the jury tampering, the defendant has also attempted to improperly influence the judicial process. First, the defendant was found in possession of sensitive witness statements at the Metropolitan Detention Center ("MDC") in plain violation of the Court's protective order. (*See e.g.*, Doc. Nos. 191 and 197 (moving to disqualify prior counsel).) The defendant was also found in possession of a photograph of the then-minor daughter of a second witness.[3]

Second, while incarcerated at the MDC, the defendant has used contraband cell phones. More particularly, in January 2024, the defendant used a contraband cell phone to contact a witness ("Witness 1")[4] who was also then incarcerated at the MDC via a video messaging application. On that video call, the defendant asked Witness 1 to visit him on his floor at the MDC. Recognizing that such contact was prohibited under MDC separation orders, the defendant told Witness 1 that he had someone who worked at the MDC who could bring Witness 1 to the defendant's floor. Witness 1 reported this incident to law enforcement, did not visit the defendant, and was promptly moved to another facility for his own safety. Nor is this the only instance in which the defendant used a contraband cell phone. In March 2023, MDC staff recovered a different contraband phone from the defendant. A review of that device showed that the defendant

---

[3] The government submits that the only reason for the defendant to have a photograph like that in his cell was to disseminate it using contraband phones, thereby more concretely proving a particular witness's cooperation (and the defendant's dangerousness).

[4] The same witness whose statements were possessed by the defendant in contravention of this Court's protective order.

used it to direct payments to individuals in Sinaloa, Mexico—*i.e.*, from where the Sinaloa cartel is based—and to other inmates.[5]

Third, a witness ("Witness 2")[6] reported that, on three separate occasions, three different individuals Witness 2 knew to be associated with the defendant or otherwise involved in narcotics trafficking attempted to contact Witness 2 while Witness 2 was incarcerated. One of these individuals approached Witness 2 directly and indicated that he wanted to speak to Witness 2 about his involvement in the defendant's trial. In addition, approximately one week before trial was scheduled to begin, an individual associated with an Eastern European drug trafficking organization ("Individual-1") approached the former home of Witness 2 in Colombia, which was at that time occupied by Witness 2's now-adult daughter (the same daughter depicted in the photograph referenced above). Even though Witness 2's extradition from Colombia to the United States in 2022 was well publicized, Individual-1 asked the person who opened the door about Witness 2's whereabouts, causing Witness 2 and his daughter significant fear for the daughter's safety. The incident prompted Witness 2's daughter to relocate.

The government also has evidence that the defendant is apparently willing to have someone he suspects of cooperating with the government killed. As the Court is aware, the defendant communicated with co-conspirators using an encrypted messaging application known as SkyECC ("Sky"), among other ways. The defendant's Sky communications include a chat in which the defendant writes in (imperfect) Spanish, among other things, "Este es sapoo / Le podes

---

5 The government does not allege that every communication on that device was the defendant's. It can, however, confirm that a review of the device makes plain that the device was principally the defendant's.

6 The same witness whose minor daughter was depicted in the photograph possessed by the defendant in contravention of this Court's protective order.

matar si ???" ("This is the snitch / You/They can kill him, yes ???"), followed by a street address. That street address matches the home address in Colombia of an identified co-conspirator who was subsequently murdered at the address the defendant provided.

III. Media Coverage

This case has engendered substantial international and domestic media coverage and public interest. Local news and major national publications previously covered the arrest and pre-trial litigation and proceedings.[7] The trial renewed media interest in the case and, in particular, the jury tampering scheme that came to light and the arrest and prosecution of three individuals

[7] *See, e.g.* Christine Chung, *Former Heavyweight Boxer Charged With Trafficking $1 Billion of Cocaine*, N.Y. TIMES (Nov. 2, 2022), https://www.nytimes.com/2022/11/02/us/goran-gogic-boxer-cocaine-charged.html; Matt Foster, *Former heavyweight boxer Goran Gogic charged with trafficking over $1 billion worth of cocaine*, CNN (Nov. 2, 2022), https://www.cnn.com/2022/11/02/sport/goran-gogic-boxer-cocaine-trafficking-spt-intl; Logan Reardon, *Former boxer charged with trafficking $1 billion worth of cocaine through U.S. ports*, CNBC (Nov 2 2022), https://www.cnbc.com/2022/11/02/former-boxer-goran-gogic-charged-with-trafficking-1-billion-worth-of-cocaine.html; Orlando Mayorquin, *DOJ charges ex-heavyweight boxer Goran Gogic with trafficking over $1 billion of cocaine*, USA TODAY (Nov. 2, 2022), https://www.usatoday.com/story/sports/boxing/2022/11/01/boxer-goran-gogic-charged-cocaine-trafficking/8241218001/; Chantz Martin, *U.S. Justice Department charges ex-boxer with trafficking more than $1 billion in cocaine*, FOX NEWS (Nov. 2, 2022), https://www.foxnews.com/sports/ex-boxer-charged-1-billion-attempted-cocaine-smuggling-operation.

sparked yet another flurry of media coverage.[8] The media attention extended to international publications as several European news outlets reported on the efforts to bribe the juror.[9]

---

[8] *See, e.g.* Santul Nerkar, *3 Charged With Trying to Bribe Juror in Boxer's Drug Smuggling Case*, N.Y. TIMES (Nov. 17, 2025), https://www.nytimes.com/2025/11/17/nyregion/brooklyn-boxer-jury-bribery-charges.html; Associated Press, *Man admits trying to bribe juror at trial of ex-heavyweight boxer accused of trafficking $1 billion worth of cocaine*, CBS NEWS (Feb. 20, 2026), https://www.cbsnews.com/news/man-admits-trying-bribe-juror-trial-ex-boxer-drug-trafficking/; John Annese, *Ex-con pleads guilty in plot to bribe juror in boxer Goran Gogic's NYC drug trafficking trial*, N.Y. DAILY NEWS (May 5, 2026), https://www.nydailynews.com/2026/05/05/ex-con-pleads-guilty-plot-bribe-juror-boxer-goran-gogics-drug-trial/; Kyle Schnitzer, Ben Kochman & Matt Troutman, *Boxer Goran Gogic's NYC trial thrown into chaos as 3 Albanian mob goons offer juror $100K bribe, get panel dissolved*, N.Y. POST (Nov. 17, 2025), https://nypost.com/2025/11/17/us-news/boxer-goran-gogics-nyc-trial-thrown-into-chaos-as-3-goons-offer-juror-100k-bribe/; Neil Fetherstonhaugh, *Three men plotted to bribe juror in Kinahan-linked $1bn cocaine haul case*, CRIME WORLD (May 27, 2026), https://www.crimeworld.com/international/three-men-plotted-to-bribe-juror-in-kinahan-linked-1bn-cocaine-haul-case/a/153502197.html; Dennis Romero, *3 accused of planning to pay juror $100K to acquit former boxer in drug trafficking case*, NBC NEWS (Nov. 17, 2025), https://www.nbcnews.com/news/us-news/3-accused-planning-pay-juror-100k-aquit-former-boxer-drug-trafficking-rcna244527; Associated Press, *3 men arrested for allegedly trying to bribe juror in Gogic trial*, CNN (Nov.17, 2025), https://www.espn.com/boxing/story/_/id/46999836/3-men-arrested-allegedly-trying-bribe-juror-gogic-trial; Kyle Lawson & Scott R. Axelrod, *Defense attorneys face removal in former boxer's transnational drug trafficking case*, SI LIVE (Jan. 28, 2026), https://www.silive.com/crime-safety/2026/01/defense-attorneys-face-removal-in-former-boxers-transnational-drug-trafficking-case.html; Charles Lane, *Staten Island men admit juror bribery attempt in boxer's $1B cocaine trafficking trial*, GOTHAMIST (May 5, 2026), https://gothamist.com/news/staten-island-men-admit-juror-bribery-attempt-in-boxers-1b-cocaine-trafficking-trial. Media attention on the trial has continued. *See e.g.,* Staff Reports, *After Juror Bribery Scandal, Boxer's Staten Island-linked Drug Case Revs Up*, SI LIVE (July 22, 2026), https://www.silive.com/crime-safety/2026/07/after-juror-bribery-scandal-boxers-staten-island-linked-drug-case-revs-up.html.

[9] *See, e.g.*, Marija Palibrk, *Tri osobe uhapšene u Njujorku, pokušale da podmite porotnika: Sto hiljada dolara da zažmuri na 20 tona kokaina*, DAN (Nov. 19, 2025), https://www.dan.co.me/vijesti/hronika/tri-osobe-uhapsene-u-njujorku-pokusale-da-podmite-porotnika-sto-hiljada-dolara-da-zazmuri-na-20-tona-kokaina-5324880/ (describing attempts at jury tampering in the trial in Montenegrin language publication); *Uhapšena tri muškarca koja su nudila porotniku 100 hiljada dolara da oslobodi Gorana Gogića na suđenju za šverc kokaina*, VIJESTI (Nov. 18, 2025), https://www.vijesti.me/vijesti/crna-hronika/783702/uhapsena-tri-muskarca-koja-su-nudila-porotniku-100-hiljada-dolara-da-oslobodi-gorana-gogica-na-sudjenju-za-sverc-kokaina; *Nudili porotniku mito od 100 hiljada dolara da oslobodi Gorana Gogića*, RTCG PORTAL (Nov. 18, 2025), https://rtcg.me/hronika/779858/nudili-porotniku-mito-od-100-hiljada-

Moreover, the media itself appears to have been used as a tool of intimidation in this case. Two days before trial was scheduled to begin, an Amsterdam-based daily newspaper publicly identified another of the government's witnesses ("Witness 3"). Witness 3 is Dutch and has family that reside in the Netherlands. (Doc. Nos. 191 at 3-4; 197 at 3.) Until that time, Witness 3's cooperation had remained confidential. The article identified Witness 3 by name and included a stenciled depiction of Witness 3 that appears to be based on a photograph of Witness 3 that was disclosed to now-disqualified defense counsel as a government exhibit in October 2024. The article referenced by name disqualified counsel and reported that he was assisted by "Dutch lawyer Yehudi Moszkowicz."[10] Following publication of this news article, the disclosure of Witness 3's identity was publicized on television in the Netherlands. The public disclosure of Witness 3's identity caused Witness 3 and his family significant fear for their safety.

The government anticipates that media coverage is likely to pick up again when the case proceeds to trial in January.

ARGUMENT

I. Legal Standard

The Second Circuit has repeatedly upheld the use of anonymous juries to protect the integrity of a trial and ensure an impartial jury. *See, e.g.*, *United States v. Napout*, 963 F.3d

---

dolara-da-oslobodi-gorana-gogica.html; Wouter Laumans & Paul Vugts, *Amerikaans proces over 18 ton coke, waarin Nederlandse crimineel getuigt, uitgesteld na omkooppoging jury*, HET PAROOL (Nov. 19, 2025), https://www.parool.nl/misdaad/amerikaans-proces-over-18-ton-coke-waarin-nederlandse-crimineel-getuigt-uitgesteld-na-omkooppoging-jury~b3c45c00/?referrer=https%3A%2F%2Fwww.google.com%2F (reporting on attempted jury tampering in *Gogic* trial in Dutch language publication).

[10] The Court may recall that the defendant wished to share sensitive discovery with this particular Dutch attorney, whom the defendant had retained. The government objected (*see* Doc. No. 119, Ex. A.), and, by order dated September 2, 2025, the Court denied the defendant's motion to amend the protective order to permit that attorney access to sensitive case material.

163, 189 (2d Cir. 2020); *United States v. Prado*, 634 F. App'x 323, 325 (2d Cir. 2016); *United States v. Kaziu*, 559 F. App'x 32, 38 (2d Cir. 2014); *United States v. Ibrahim*, 529 F. App'x 59, 65 (2d Cir. 2013); *United States v. Kadir*, 718 F.3d 115, 120-21 (2d Cir. 2013); *United States v. Pica*, 692 F.3d 79, 81 (2d Cir. 2012); *United States v. Quinones*, 511 F.3d 289, 291 (2d Cir. 2007); *United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006); *United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995); *United States v. Wong*, 40 F.3d 1347, 1376-77 (2d Cir. 1994); *United States v. Thai*, 29 F.3d 785, 800-01 (2d Cir. 1994); *United States v. Amuso*, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991); *United States v. Vario*, 943 F.2d 236, 239 (2d Cir. 1991); *United States v. Tutino*, 883 F.2d 1125, 1132 (2d Cir. 1989); *United States v. Persico*, 832 F.2d 705, 717 (2d Cir. 1987); *United States v. Thomas*, 757 F.2d 1359, 1364-65 (2d Cir. 1985); *United States v. Barnes*, 604 F.2d 121, 133-43 (2d Cir. 1979).

It has adopted a two-step process for district courts to follow. First, the court should determine whether there is strong reason to believe that the jury needs protection. Second, if the court determines that anonymity is necessary to protect the jury, it should take reasonable precautions to minimize any prejudice that might arise from an anonymous jury. *See Paccione*, 949 F.2d at 1192. Importantly, "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a *voir dire* designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." *Aulicino*, 44 F.3d at 1116. Thus, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." *Paccione*, 949 F.2d at 1192.

To determine whether there is reason to believe the jury's safety and impartiality need protection, courts in this circuit have considered various factors including: (1) the dangerousness of the defendant; (2) whether the defendant or his associates have engaged in past attempts to interfere with the judicial process; (3) whether the defendant has access to the means to harm the jury; and (4) whether the trial is likely to attract media attention and publicity. *See United States v. Wilson*, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (Garaufis, J.) (citing *Paccione*, 949 F.2d at 1192; *Vario*, 943 F.2d at 240; *Tutino*, 883 F.2d at 1132-33 (2d Cir. 1989)). All these factors need not be present. Rather, "anonymity is appropriate when some combination of these factors is present." *United States v. Ashburn*, 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) (internal quotation marks omitted).

The district court has broad discretion to employ sequestration of a jury, and the factors it considers in making that determination are those that it also must consider in deciding whether an anonymous jury is appropriate. *See, e.g.*, *United States v. Eisen*, 974 F.2d 246, 267 (2d Cir. 1992); *United States v. Cacace*, 321 F. Supp. 2d 532 534 (E.D.N.Y. 2004) (citing *Thai*, 29 F.3d at 801; *Thomas*, 757 F.2d at 1364-65; and *United States v. Persico*, 621 F. Supp. 842, 879 (S.D.N.Y. 1985)).

Courts assess a defendant's dangerousness by, among other things, the seriousness of the charged crimes, including whether the defendant is charged with participating in a large-scale criminal enterprise. *See, e.g.*, *Gotti*, 459 F.3d at 346 (noting that defendants were charged with membership in an organized crime family); *Wilson*, 493 F. Supp. 2d at 399-401 (noting that defendant was charged with murdering two police officers and was a member of a violent gang).

With respect to a defendant's past attempts to tamper with the judicial process, courts look for evidence of previous intimidation, bribery, or violence toward witnesses or jurors.

*See, e.g.*, *Aulicino*, 44 F.3d at 1116 (noting that defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence); *Paccione*, 949 F.2d at 1192-93 (noting that government witness had received anonymous, middle-of-the-night phone calls advising him to "remember[] nothing" and a defendant had threatened others with a baseball bat and pistol); *Vario*, 943 F.2d at 240 (noting that co-conspirator had approached grand jury witness).

When a defendant is under pretrial detention, whether he has means to harm the jury often hinges on the extent of his connections outside of prison. *See, e.g.*, *Wilson*, 493 F. Supp. 2d at 400 (granting a motion for an anonymous jury in part because defendant was "a member of the Stapleton Crew and . . . this organization has other members and associates who are currently, and will be, at large at the time of the trial.").

Finally, whether the trial is likely to attract media attention may be illustrated by the nature and degree of pretrial publicity. *See, e.g.*, *Paccione*, 949 F.2d at 1193 (noting the case had already been "front-page news"); *Vario*, 943 F.2d at 240 (citing a single New York Newsday cover story).

When the court determines that anonymity is necessary to protect the jury, two procedures adequately protect a defendant's right to an unbiased jury. *See, e.g.*, *United States v. Bellomo*, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003) (granting motion for anonymous jury and noting the requirement "that a balance be struck between the government's interest in the judicial process and the defendant's interest in preserving and safeguarding the presumption of innocence"); *Thai*, 29 F.3d at 801; *Amuso*, 21 F.3d at 1264-65; *Paccione*, 949 F.2d at 1192; *Vario*, 943 F.2d at 239; *Tutino*, 883 F.2d at 1132; *Persico*, 832 F.2d at 717-18; *Thomas*, 757 F.2d at 1365. First, the court should "conduct a *voir dire* designed to uncover bias as to issues in the case[ ] and as to the defendant himself." *Paccione*, 949 F.2d at 1192. Second, to reduce the possibility that

the jury will infer that the defendant is dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." *Paccione*, 949 F.2d at 1192; *see also Aulicino*, 44 F.3d at 1116. In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media. *See, e.g.*, *Thai*, 29 F.3d at 801; *Paccione*, 949 F.2d at 1191-92; *Thomas*, 757 F.2d at 1363; Memorandum & Order, *United States v. Basciano*, 03-CR-929 (E.D.N.Y. Nov. 17, 2005) at 5 (ECF No. 354); *United States v. Amato*, 306 Fed. Appx. 630, 2009 WL 59165, at *3 (2d Cir. Jan. 12, 2009) (summary order); *Thai*, 29 F.3d at 801; *Amuso*, 21 F.3d at 1265; *Tutino*, 883 F.2d at 1133.

Although a defendant has the right to a meaningful *voir dire* of potential jurors, *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in *voir dire* largely rests within the discretion of the trial judge. *See United States v. Silva*, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); *United States v. Barnes*, 604 F.2d 121, 137-40 (2d Cir. 1979) (noting that "as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").

Numerous courts have recognized that, where anonymity is necessary, the court can instruct the jury as to why anonymity is appropriate in a neutral manner that minimizes any risk of prejudice. Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no per se rule that it may not be burdened." *Thomas*, 757 F.2d at 1364; *see also United States v. Scarfo*, 850 F.2d 1015, 1026 (3d Cir. 1988). In some cases, the court has explained the jury's partial anonymity by telling prospective jurors that anonymity would allow

them to feel more comfortable in giving candid answers to the personal questions asked in *voir dire*.

Similarly, courts in this district have explained to jurors that they are being escorted in and out of the courthouse to protect their privacy and ensure a timely start to each day of trial. *See, e.g.*, *United States v. Kelly*, No. 19-CR-286 (AMD), 2020 WL 8482693, at *4 (E.D.N.Y. Oct. 9, 2020), *reconsideration denied*, No. 19-CR-286 (AMD), 2021 WL 431030 (E.D.N.Y. Feb. 8, 2021); *United States v. Dervishaj*, No. 13-CR-668 (ENV), 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015); *United States v. Basciano*, 05-CR-060 & 03-CR-929 (NGG); *United States v. Stone*, 05-CR-401 (ILG); *United States v. McGriff*, 04-CR-966 (FB); *United States v. Wilson*, 04-CR-1016 (NGG); *United States v. Aguilar*, 01-CR-1367 (RJD); *United States v. Nelson*, 94-CR-823 (DGT); *United States v. Orena*, 93-CR-1366 (ERK); *United States v. Malpeso*, 93-CR-1365 (RJD); *United States v. Cutolo*, 93-CR-1230 (EHN); *United States v. Thai*, 91-CR-838 (CBA).

## II. The Jury's Impartiality Requires Additional Protection

The interests of justice will best be served in this case by protecting the identities of the jurors. While only some combination of the factors the court need consider in making this determination need be met, this case hits them all. Particularly given the prior jury tampering effort in this case, an anonymous, partially-sequestered jury is paramount in this case.

### A. The Defendant is Dangerous

The defendant is dangerous. As noted above, at a minimum, he identified someone as a potential government cooperator, provided his home address, and asked whether the person could be killed.[11] Moreover, the crimes with which the defendant are charged pertain

[11] There is some degree of ambiguity due to the defendant's use of imperfect Spanish. However, there is no ambiguity that he identified an individual as a potential cooperator and then immediately discussed the killing of this person.

to his participating in a large-scale criminal enterprise including Balkan organized crime. *See, e.g.*, *Gotti*, 459 F.3d at 346 (noting that defendants were charged with membership in an organized crime family); *Wilson*, 493 F. Supp. 2d at 399-401 (noting that defendant was charged with murdering two police officers and was a member of a violent gang).

B. There Has Already Been Interference with the Judicial Process

There has already been jury tampering in this case. As detailed above, three individuals were charged and convicted of obstruction of justice for jury tampering in the *Gogic* trial. The prior bribe offered to a juror weighs heavily in support of anonymity for this trial.

Additionally, the defendant and his co-conspirators or supporters have previously obstructed justice in this case, another factor that supports jury anonymity and partial sequestration. As detailed above, the defendant, together with others on his behalf, have a history of obstructive conduct, including (1) the defendant's attempt to intimidate and/or influence the testimony of a then-suspected trial witness by contacting the witness via video call on a contraband phone in the MDC and telling the witness that the defendant could have an MDC employee move the witness to the defendant's unit, (2) the defendant's pre-trial attempt to intimidate and/or influence the testimony of Witness 2 witness through Witness 2's daughter and his possession of a photograph of the daughter in his jail cell, (3) the defendant's possession of another witness's 3500 material in his jail cell; and (4) the use of the media to publicly out and intimidate yet a third witness.

The facts underlying several of these incidents show that the defendant's pretrial detention did not prevent him from interfering with the judicial process. Furthermore, as noted above, the defendant worked with and for dangerous and violent cartels and members of organized crime that operate out of the Balkans and have a global reach. Relatedly, the defendants prosecuted

in the jury tampering case have ties to New York-based Italian and Albanian organized crime, which at least suggests an overlapping interest in this case by both Italian and Albanian organized crime. The defendant has no shortage of available individuals willing to commit criminal acts at his direction or on his behalf. Indeed, his quoted text communication directing a murder is but one example. *See, e.g.*, *Wilson*, 493 F. Supp. 2d at 400 (citing the defendant's participation in a violent gang).

C. <u>Media Coverage Will Expose Jurors to Extraordinary Pressure</u>

Since the defendant's arrest in October 2022 and the attempted jury tampering in November 2025, this case has garnered attention from both local, national and international media sources, and media coverage can be expected to continue during trial. As detailed above, the jury tampering in this case last year and the related prosecutions of three individuals received widespread coverage in print and internet outlets. This factor weighs heavily in support of empaneling an anonymous jury.

The expected media attention may put significant pressure on jurors to reach a verdict based on considerations other than the evidence presented at trial, such as avoiding the notoriety associated with the defendant or conversely, seeking fame. Notably, courts have ordered anonymous juries in cases with substantial media coverage, even where neither the defendant nor his associates had any documented history of jury or witness tampering. *See, e.g.*, *Kadir*, 718 F.3d at 121 (affirming the district court's decision to empanel an anonymous jury where defendants were charged with violent crime and there was extensive media coverage of the case); *United States v. Wong*, 40 F.3d 1347, 1377 (2d Cir. 1994).

In *Barnes*, the Second Circuit upheld the empanelment of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would

not become realities." 604 F.2d at 141. The government respectfully submits that, under the circumstances of this case, this factor weighs heavily in favor of empaneling an anonymous jury.

D. An Anonymous Jury Will Not Prejudice the Defendant

A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (1) the right to make informed choices during the jury selection process, and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity. Both concerns can be readily addressed.

The information that will be kept from the parties and counsel if this motion is granted—namely, the names, addresses and places of employment of prospective jurors—is not crucial to the jury selection process. In selecting jurors, the parties will learn, among other things, the geographic area in which prospective jurors reside, the general nature of their employment, their age, and the level of their formal education. The names of prospective jurors, to the extent they provide information about ethnicity, are not needed for a meaningful *voir dire*. *See Georgia v. McCollum*, 505 U.S. 42 (1992) (rule articulated in *Batson*, prohibiting use of peremptory challenges in racially discriminatory manner, applies to defendant).

As for partial sequestration, the government submits that, particularly in light of last year's effort to tamper with the jury in this case, this jury warrants heightened protection and safeguards against surveillance and attempts to unmask any jurors. The government proposes that the jurors be told that they are being escorted in and out of the courthouse to protect their privacy and ensure a timely start to each day of trial. This practice has been routinely followed in this district and should be followed here as well. Indeed, the media scrutiny expected to surround the trial is, in fact, a basis for the instant motion. *See, e.g., Guzman Loera*, No. 09-CR-466 (BMC) (E.D.N.Y. Feb. 5, 2018), ECF No. 187 at 4 ("The Court will instruct the jurors that their daily transportation and escort within the courthouse are provided to protect their privacy and to ensure

that the trial proceeds expeditiously."); *United States v. Galestro*, No. 06-CR-285 (ARR), 2008 WL 2783359, at *3 n.3 (E.D.N.Y. July 15, 2008) ("Jurors are generally told that such steps are not unusual and are taken to ensure their privacy and impartiality in light of the media and public attention the trial is expected to receive."); *see also Kelly*, 2020 WL 8482693, at *4; *United States v. Dervishaj*, No. 13-CR-668 (ENV), 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015).

CONCLUSION

For the foregoing reasons, the government respectfully requests that the venire and petit jury in this case be anonymous and partially sequestered.

Dated: Brooklyn, New York
October 6, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/
Nomi D. Berenson
Katherine P. Onyshko
Francisco J. Navarro
Assistant United States Attorneys
(718) 254-7000

cc: Clerk of Court (JMA) (by ECF)
Counsel of Record (by ECF)